1
2
3
4                        UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    UNITED STATES OF AMERICA,                Case No.  23-cr-00269-JSW-3
                                                         23-cr-00268-JSW-2
         Plaintiff,
8
9        v.                                   ORDER DENYING MOTION TO
                                              DISMISS BASED UPON
10   DEVON CHRISTOPHER WENGER,                PROSECUTORIAL MISCONDUCT
                                              AND INEFFECTIVE ASSISTANCE OF
         Defendant.                           COUNSEL OR IN THE ALTERNATIVE
11                                            A CHANGE OF VENUE
12                                            Re: Dkt. No. 187
13
14         Now before the Court is Defendant Devon Christopher Wenger's Motion to Dismiss Based

15   Upon Prosecutorial Misconduct and Ineffective Assistance of Counsel, or in the Alternative,

16   Defendant's Request for a Change of Venue.  The Court has considered the parties' papers,

17   relevant legal authority, and the record in this case, and it finds the matter suitable for resolution

18   without oral argument.  *Cf.* Civ. L.R. 7-1(b).  For the following reasons, the Court DENIES the

     motion.
19
                                        **BACKGROUND**
20
21         Defendant is a former police officer charged with one count of Conspiracy Against Rights,

22   18 U.S.C. section 241, and one count of Deprivation of Rights Under Color of Law, 18 U.S.C.

     section 242.  (Dkt. No. 1, Indictment, at 3.)[1]
23
24         Defendant is also charged in a related case, *United States v. Harris et al.*, 23-cr-00268-

25   JSW, for Conspiracy to Distribute and Possess with the Intent to Distribute Anabolic Steroids, 21

26   U.S.C. sections 846, 841(a)(1) and (b)(1)(E)(i), and Destruction, Alteration, and Falsification of

27   Records in Federal Investigations, 18 U.S.C. section 1519.  The Court permitted Defendant in the

28   _____
     [1] All docket citations refer to Case No. 23-cr-269-JSW unless otherwise stated.

United States District Court
Northern District of California

-268 case to join this briefing because dismissal of charges against Defendant in this action could impact resolution of the charges against Defendant in the related case.  (*See United States v. Harris et al.*, 23-cr-00268-JSW, Dkt. No. 122.)  Defendant's reply brief is thus styled as a "Joint Reply."  (*See* Dkt. No. 205.)

Defendant previously moved (1) to suppress fruits of two federal search warrants into his cell phone data; (2) to sever trials of his two counts in the -269 case; (3) to sever his trial from that of his co-defendants; and (4) for a *Franks* hearing to test the validity of the search warrants for his cell phone.  (Dkt. Nos. 103, 104, 109, 112.)  Following a hearing, the Court permitted additional briefing on the motion to suppress to account for a newly disclosed third federal search warrant.  (*See* Dkt. No. 161.)  The Court subsequently denied the motions.  (Dkt. Nos. 156, 160, 180.)

Defendant moved for leave to file a motion to dismiss, which the Court granted.  (Dkt. No. 183.)  The Court ordered Defendant to "demonstrate reasonable diligence in raising the issues identified in his motion for leave."  (*Id.* at 2:18-19.)

Defendant now moves for dismissal on five bases: (1) "extreme investigative methods"; (2) "knowing presentation of false evidence"; (3) *Brady* violations; (4) selective prosecution; and (5) ineffective assistance of counsel.  Alternatively, Defendant seeks a change of venue.

## ANALYSIS

### A.    Legal Standards.

"Although courts have the power to dismiss an indictment both on due process grounds and as part of their inherent supervisory power. . ., the power is exercised sparingly." *United States v. Busher*, 817 F.2d 1409, 1411 (9th Cir. 1987).

The Court may dismiss an indictment with prejudice "only in cases of flagrant prosecutorial misconduct." *United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991), *abrogated on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008).  A defendant seeking dismissal as a result of outrageous government conduct must meet an "extremely high standard." *United States v. Struckman*, 611 F.3d 560, 573 (9th Cir. 2010) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991)) (agreeing dismissal not required even though the government's actions were "quite disturbing" and included "flat

2

1   misstatements" to authorities).  The defendant must "demonstrate governmental misconduct 'of

2   the most shocking and outrageous kind,' so as to warrant dismissal."  *United States v. Matta-*

3   *Ballesteros*, 71 F.3d 754, 764 (9th Cir. 1995), *opinion amended on denial of reh'g,* 98 F.3d 1100

4   (9th Cir. 1996).

5          Courts must be mindful to not encroach on executive procedure when exercising their

6   inherent authority to manage judicial proceedings.  *United States v. Barrera-Moreno*, 951 F.2d

7   1089, 1092 (9th Cir. 1991).  Dismissal of an indictment is appropriate under a court's inherent

8   supervisory authority only if "no lesser remedial action is available."  *Id.*

9   **B.     Wenger Does Not Demonstrate Reasonable Diligence.**

10          The Court noted in its Order granting Defendant leave to file a motion to dismiss that

11  Defendant raised "for the first time. . . that the prosecution against him is retaliation for

12  Defendant's whistleblower activities.  Defendant does not explain why this argument was

13  unavailable to him prior to the motion deadline."  (Dkt. No. 183, at 2:5-8.)  The Court ordered

14  Wenger to "demonstrate reasonable diligence in raising the issues identified in his motion for

15  leave."  (*Id.* at 2:18-19.)

16          Wenger does not attempt to make such a showing.  Although Wenger argues that his

17  previous counsel was deficient, Wenger does not explain why he waited five months after

18  appointment of his current counsel to seek leave to file the instant motion to dismiss.

19  **C.     Defendant Fails to Demonstrate "Extreme Investigative Methods" or to Explain Why
           the Investigative Methods in this Action Warrant Dismissal.**

20          Wenger claims that law enforcement conduct during the investigatory stage of this action

21  was "so outrageous that due process principles. . . absolutely bar the government from invoking

22  judicial process to obtain a conviction."  (Mot. at 3:23-25 (quoting *United States v. Russell*, 411

23  U.S. 423, 431-32 (1973)).)  According to Wenger, the investigation was "extreme" because (1) the

24  Contra Costa County Investigator assigned to the case, Larry Wallace, was unfamiliar with the

25  California Electronic Communications Privacy Act ("CalECPA," California Penal Code section

26  1546.1); (2) Wallace was "subjective and arguably biased" when reviewing the evidence, (Mot. at

27  5:7); and (3) Wallace disclosed confidential information to unauthorized parties.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1      **1.      Wallace's Unfamiliarity with CalECPA Does Not Warrant Dismissal.**

2           Wenger's cell phone was seized in March 2022 pursuant to a warrant issued by the

3      Superior Court of Contra Costa County upon request of Investigator Larry Wallace.  (*See* Dkt. No.

4      106, Declaration of Candice L. Fields, Ex. 3, at DCW-000067-68.)  Investigator Wallace

5      purportedly did not comply with the CalECPA because he "failed to seal non-relevant data" and

6      permitted use or review of Wenger's cell phone data without a court order.  (Dkt. No. 187, Mot., at

7      4:12-13.)

8           Wenger fails to show that Inspector Wallace's unfamiliarity with state law necessarily

9      means that the investigators violated Wenger's federal rights.  Federal courts treat "additional

10     [state] protections exclusively as matters of state law," outside of the protection of the Fourth

11     Amendment.  *Virginia v. Moore*, 553 U.S. 164, 171 (2008).  "[E]vidence obtained in compliance

12     with federal law is admissible in federal courts without regard to state law."  *United States v.*

13     *Chavez-Vernaza*, 844 F.2d 1368, 1373 (9th Cir. 1987).  Accordingly, Inspector Wallace's lack of

14     knowledge of the CalECPA is irrelevant.

15          Wenger cites *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), for the proposition

16     that federal law, too, requires law enforcement "to isolate and seal unrelated evidence to prevent

17     unauthorized use."  (Mot., at 4:16-17.)  Wenger appears to argue that failure to seal his electronic

18     information in compliance with the CalECPA runs afoul of his Fourth Amendment rights because

19     the information could be leaked for other purposes.  *Tamura* does not support this result.  In

20     *Tamura*, the Ninth Circuit held that seizure of all accounting department records where the

21     warrant authorized only search of the records and seizure of specific documents was unlawful as

22     executed.  *Tamura*, 694 F.2d at 595-96.  Even so, the court declined to find that "the officers so

23     abused the warrant's authority that the otherwise valid warrant was transformed into a general one,

24     thereby requiring all fruits to be suppressed."  *Id.* at 597.  If wholesale seizure of and failure to seal

25     unrelated files does not warrant suppression, as in *Tamura*, it does not warrant dismissal of the

26     entire case for misconduct here.

27          Wenger further relies on *United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013) for the

28     proposition that adequate training is necessary to avoid due process violations.  That decision was

4

a dissenting opinion from a denial of a petition for rehearing en banc. *Id.* at 625-26. The issues in that case were *Brady* and *Giglio* violations relating to contaminated laboratory samples, not failure to train investigators. *See id. Olsen* does not aid Wenger.

Even if dismissal on this basis were appropriate, Wenger did not meet his burden to show that Inspector Wallace used "unsealed and irrelevant text messages" from his phone data. (*See* Mot., at 4:26-27.) Wenger cites no messages which Wallace misused and which should have been sealed.

### 2.    Wenger Does Not Demonstrate Unlawful Bias.

Wenger next argues that Inspector Wallace committed misconduct by "disregard[ing] objectivity in favor of an incriminating narrative." (Mot., at 5:11-12.) Wenger asserts that Inspector Wallace was impermissibly biased because he interpreted a text message, "You take the 40," as referring to a weapon rather than a police unit. The text message at issue was allegedly sent from Defendant Rombough to a non-party officer (not Wenger). (Dkt. No. 187-2, Declaration of Michael L. Rains ("Rains Decl."), ¶ 31.) A more innocent possible explanation existed because Rombough and the other officer belonged to "police unit #40." (*Id.*) Wenger does not provide context for the text message.

This argument lacks merit. The message is unrelated to Wenger, and Inspector Wallace's interpretation of a text message that does not involve Wenger does not reflect Wallace's bias against Wenger.[2]

Wenger's cited legal authority similarly is wholly irrelevant to his bias argument. Wenger relies on *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991)[3] for the proposition that

---

[2] Wenger also argues that Wallace is biased due to "[h]is reliance on [Racial Justice Act]-related issues." (Mot. at 5:24-26.) This argument is unsupported by citations to fact or law, and Wenger fails to explain how those issues relate to bias against Wenger.

[3] Wenger also cites *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) without a pin cite for the proposition that "baseless or legally flawed reasoning in investigatory conduct can support a finding of governmental misconduct, which calls into question the reliability of any evidence or conclusions drawn." (Mot. at 5:27-6:2.) *Hinkson*'s discussion of potential misconduct appears to be into whether the government should have investigated its star witness's claimed military service. *Hinkson*, 585 F.3d at 1285 n.26. The Ninth Circuit found that the government did not commit misconduct, and further that the defense lacked diligence in investigating impeachment evidence. *Id.* This case does not aid Wenger.

United States District Court
Northern District of California

5

disregarding evidence in order to craft an incriminating narrative warrants dismissal.  In that case, the defendant's attorney provided information regarding the defendant to the government and "then actively worked with [the government] to develop a case against [the defendant]."  *Id.* at 1519.  The court found that the government knowingly "took advantage" of a conflict of interest and used the conflict to craft its investigation.  *Id.* at 1519-20.  No similar accusations are present here.

Wenger also relies on *United States v. Ramirez*, 976 F.3d 946 (9th Cir. 2020) for "the idea that failing to confirm contextual relevance can render government actions arbitrary."  (Mot. at 5:18-19.)  *Ramirez* involved a "ruse" by the FBI to deceive a suspect into believing that his home had been burglarized so that the suspect would return home to be interviewed.  976 F.3d at 950.  The court found that the FBI agents acted unreasonably and outside the scope of the warrant by lying in order "to bring [the defendant] and his car within the ambit of the warrant, when they were not otherwise within its ambit."  *Id.* at 955.  *Ramirez* did not involve questions of bias against the suspect or disregard of relevant context.  *See generally*, *id.*  Wenger thus fails to show dismissal is appropriate on this basis.

### 3.    Wenger Does Not Demonstrate Unlawful Disclosure of Information nor Demonstrate that Disclosure Warrants Dismissal.

Wenger's final argument that the investigation was so "extreme" as to warrant dismissal hinges on Inspector Wallace's "disclosure of sensitive investigative information to the Mayor and City Manager, while excluding relevant police leadership[.]"  (Mot. at 6:4-5.)  In support, Wenger cites *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) for the proposition that "breaching confidentiality in government investigations can constitute misconduct."  (*Id.* at 6:6-8.)

*Chapman* does not discuss the issue of breach of confidentiality.  Instead, that case involves *Brady* and *Giglio* violations resulting in dismissal mid-trial.  *See Chapman*, 524 F.3d at 1085.

Moreover, Wenger provides no information about the context or content of Inspector Wallace's alleged disclosures; he merely cites a declaration from counsel in an unrelated action that Wallace had a meeting with the Antioch mayor and city manager, the Contra Costa County

6

1    District Attorney, and the Chief of Inspectors on the same day that he obtained a state warrant.

2    (Rains Decl. ¶ 29.)  Apparently, in that meeting, the District Attorney alerted the Mayor and City

3    Manager that his office "was going to be conducting police activity at the Antioch Police

4    Department" the next day.  (*Id.* ¶ 30.)  This allegation fails to show that Inspector Wallace made

5    unlawful disclosures relating to Wenger; instead, it indicates that the District Attorney alerted the

6    Mayor and City Manager about an upcoming investigation generally.

7         To the extent Wenger claims Inspector Wallace's public disclosure of text messages

8    exchanged between Antioch and Pittsburgh police officers was unlawful, his claim fails.  First,

9    those disclosures were mandated by two state court orders.  (Dkt. No. 191-5, Declaration of Simon

10   O'Connell, Exs. C, E.)  Second, even if the state courts erred in ordering disclosure of the text

11   messages, Wenger has not identified any rights which were or could have been violated by the

12   disclosures.  None of the text messages disclosed in the reports was obtained from a search of

13   Wenger's phone.  The only message sent by Wenger and disclosed in Inspector Wallace's report

14   was lawfully seized in a search of Defendant Amiri's iCloud account.  (Dkt. No. 131, Ex. 11,

15   Amiri iCloud Rollover Warrant, ¶ 13 [US-000881-882]; Dkt. No. 189-6, Ex. D, at 4 (listing

16   officers from whom texts were seized and not including Wenger).)  Wenger has no privacy interest

17   in Amiri's data.  *See U.S. v. Miller*, 425 U.S. 435, 443 (1976) (holding that the Fourth Amendment

18   does not protect "information revealed to a third party. . . even if the information is revealed on the

19   assumption that it will be used only for a limited purpose and the confidence placed in the third

20   party will not be betrayed.").

21        Wenger has failed to make a showing that Inspector Wallace engaged in misconduct

22   meriting dismissal.

23   **D.    Wenger Fails to Show the Government Presented False Evidence.**

24        Wenger argues that dismissal of the indictment is warranted because the prosecution in this

25   action has made pervasive and material misrepresentations to the Court.  Wenger claims that the

26   Government (1) misrepresented its cooperation with Inspector Wallace and the state warrant for

27   Wenger's cell phone by downplaying that the investigation was joint between state and federal law

28   enforcement; (2) by not disclosing that the FBI had seized Wenger's phone prior to the issuance of

the federal warrants; and (3) by misrepresenting "that there were only two federal search warrants in existence in this case, the May 19, 2023 federal warrant and the July 24, 2023 warrant." (Mot. at 7:18-20 (emphasis omitted).) Wenger's arguments are without merit.

### 1. Wenger Does Not Identify Any Misrepresentations to the Court Regarding Cooperation Between State and Federal Authorities.

Wenger claims that the following statements were misrepresentations to the Court:

1. "As a result, even if the United States were to introduce evidence from Wenger's phone in this case, any evidence would be evidence seized through the force of a valid federal search warrant and seizure based on knowledge from untainted evidence independently gathered and unrelated to the illegal state warrant and seizure thereunder." (Mot. at 7:8-12 (quoting Dkt. No. 163).)

2. "The federal warrants were obtained independently of any information derived from the state warrants." (Reply, at 2:26-27 (quoting Assistant U.S. Attorney Ajay Krishnamurthy).)[4]

The Government responds that there is a distinction between, on the one hand, asserting that the evidence used to obtain the federal warrants was independent from evidence obtained from the state court warrant procured by Inspector Wallace, and on the other hand, asserting that the investigations themselves were independent. The Government never made the latter representation, and the two quotes picked out by Wenger do not suggest otherwise.

The Court agrees with the Government. Cooperation between state and federal authorities has been apparent throughout this litigation. Special Agent Kular disclosed the state court warrant to the Magistrate Judge when seeking federal warrants to search Defendant's data. (*See* Dkt. No. 180, Order Denying Motions to Suppress and Motion for *Franks* Hearing, at 3.)

Special Agent Kular provided sufficient information from lawful searches into Amiri and Harris's data to demonstrate probable cause to search Wenger's data. (*Id.* at 8.) The affidavits contained no reference to information found in Wenger's phone. The Government thus did not

---

[4] Defendant cites to "Exhibit A" at page 11 for this quotation. No exhibits were attached to Defendant's reply brief. Defendant's opening brief uses numbered, not lettered, exhibits. The Court permitted Defendant an additional opportunity to file his Reply exhibits, and Defendant submitted numbered, not lettered, exhibits. (*See* Dkt. Nos. 225, 227.) Even if the Court construes "Exhibit A" to mean "Exhibit 1," the Court could not locate this quotation from Mr. Krishnamurthy. The Court nevertheless assumes for the sake of argument that the quotation is accurate.

United States District Court
Northern District of California

make any misrepresentations to the Court when it asserted that the evidence in support of the federal warrants was obtained independently from the state warrants.[5]

### 2. The Government's Temporary Seizure of Wenger's Phone Does Not Merit Dismissal.

Wenger next argues that the Government lied to the Court by omitting that it possessed Wenger's cell phone before it obtained a warrant, in contrast to the Government's representations that Contra Costa County had seized the phone. Wenger points out that the FBI logged possession of his phone in March 2022, a year before the Government obtained warrants to search or seize Defendant's phone. The Government denies any improper conduct, and it claims that "temporary storage of evidence as an administrative matter by the FBI" is not "untoward." (Dkt. No. 194, Opp., at 12:23-24.)

The log states that Wallace turned over an Apple iPhone 12 belonging to Defendant on March 28, 2022. (Dkt. No. 190-14, Ex. 5, at US-000225.) Special Agent Thuy Zoback "relinquished custody" of the phone to "storage" on March 29, 2022. (*Id.* at US-000227.) On April 8, 2022, Special Agent Rodney Gauthier checked out the phone and released it to the Contra Costa County District Attorney. (*Id.*) No agent checked out the phone for review during the period in which the FBI possessed the phone. (*See id.*) Without more, the Court cannot say that the Government made misrepresentations to the Court regarding its custody of the cell phone.

The Court's conclusion is bolstered by analogy to unlawful seizure analysis. Assuming for the sake of argument that the Government unlawfully seized Wenger's phone by holding it in storage on behalf of the District Attorney's Office, the phone and its contents would not be subject to suppression. *United States v. Saelee*, 51 F.4th 327 (9th Cir. 2022) is instructive. In that case, the Ninth Circuit explained that unlawfully seized objects can later be "reseized" if the government obtains "an independently sought-and-issued warrant," even if the object has been continuously within police control. *Id.* at 337. The Ninth Circuit discussed with approval a Fifth Circuit opinion holding that a "re-seizure" of a computer can cure an earlier unlawful seizure,

---

[5] Wenger also argues that the independent source doctrine does not apply here because the state and federal authorities cooperated. Wenger does not cite any case law for this proposition, and the Court is aware of none.

9

1    "especially" when the "police's assertedly unlawful custody did not make 'any use of the
2    computer' while they held it but 'simply safeguarded it.' "  *Id.* at 338 (quoting *United States v.*
3    *Grosenheider*, 200 F.3d 321, 329 (5th Cir. 2000)).  Here, like the police in *Grosenheider*, who did
4    not search the contents of the unlawfully seized computer, the FBI did not search the contents of
5    Wenger's purportedly unlawfully seized cell phone until after they obtained a valid warrant to do
6    so.  *See id.*  Instead, the FBI simply stored the cell phone for a brief period before returning the
7    cell phone to state authorities.  Given that suppression is unwarranted, the FBI's brief possession
8    of Wenger's cell phone does not require the more extreme remedy of dismissal.

9        **3.    The Government Disclosed the Existence of Other Federal Warrants.**

10        Wenger's final argument, that the Government failed to disclose the existence of search
11    warrants for other officers involved in this case, is baffling.  Those warrants have been the subject
12    of motions filed by Amiri and Rombough.  (*See* Dkt. Nos. 113, 139.)  They are explained in the
13    federal search warrants for Wenger.  (*See* Dkt. No. 106, Declaration of Candice L. Fields, Ex. 3,
14    May 19, 2023 Search Warrant, ¶ 9.)  The evidence obtained from certain of those warrants was the
15    basis for the federal search warrants into Wenger.  (Order Denying Motions to Suppress and
16    Motion for *Franks* Hearing, at 3-5.)  The existence of those warrants was never concealed from
17    the Court.  Accordingly, representations regarding the issuance of additional search warrants does
18    not support dismissal of the charges against Wenger.

19    **E.    The Government Has Not Violated *Brady*.**

20        Wenger next argues that dismissal of the -269 action is appropriate because the
21    Government suppressed information relating to Harris's plea deal in the -268 case in violation of
22    *Brady v. Maryland*, 373 U.S. 83 (1963).  According to Wenger, the Government provided the
23    information to Wenger's counsel in the -268 action, but not to counsel of record in the -269
24    matter.  The Government responds that it could not have withheld exculpatory information by
25    producing it to him, and that in any event, the plea was taken in open court with Wenger and his
26    counsel present.

27        The prosecution violates *Brady* when it suppresses evidence that is favorable to the
28    defendant and which is material to guilt or innocence.  *United States v. Gordon*, 844 F.2d 1397,

United States District Court
Northern District of California

1403 (9th Cir. 1988). Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Disclosure must be made with sufficient time to "be of value to the accused." *Id.* (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)). *Brady* applies prior to trial so long as a pretrial outcome may have been different had the disclosure been made. *Parker v. Cnty. of Riverside*, 78 F.4th 1109, 1113 (9th Cir. 2023) (noting that *Brady* applies in the context of guilty pleas and motions to suppress). However, *Brady* does not apply if "there is no judicial proceeding that could be affected by the withheld [evidence]." *Id.*

Wenger does not explain why Harris's plea agreement is impeachment or exculpatory material in the -269 case. In any event, the plea was taken in open court, with Wenger present. (*See United States v. Harris*, 23-cr-268-JSW-1, Dkt. No. 109, 112, 113.) Wenger was personally aware of Harris's plea.

Even if Wenger had not been aware of the plea, *Brady* is irrelevant because the nondisclosure did not affect any judicial proceedings. *See Parker*, 78 F.4th at 1113. Harris pleaded guilty in September 2024, long after the initial motion deadline. Wenger's counsel in the -269 matter learned of the plea prior to November 4, 2024, the date set by the Court for further motion practice. As no proceedings occurred in the interim, no prejudice resulted. The circumstances do not support a finding that the Government violated *Brady*.

**F.    Purported Late Discovery Does Not Warrant Dismissal.**

Wenger next argues that dismissal is required because the Government has a pattern of producing discovery long after the May 3, 2024 discovery deadline. (*See* Dkt. No. 91 (setting discovery deadline for Government as "close of business on 5/3/2024").) Wenger objects specifically to "discovery as old as 2018" which was produced "just days before the deadline for defense counsel to file their motion for dismissal." (Mot., at 10:25-27.)

Federal Rule of Criminal Procedure 16(a)(1)(E) requires production of "documents and objects" that are "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Here, the Government asserts that it has promptly turned over discovery upon

United States District Court
Northern District of California

United States District Court
Northern District of California

receipt, and it explains that it obtained the 2018 materials only three days before production. (Opp., at 14:14-19.)

If any belated discovery is improper, dismissal is unwarranted because a lesser remedy exists: exclusion. *See Struckman*, 611 F.3d at 577 (finding exclusion of evidence sufficient cure for *Brady*/*Giglio* violations instead of dismissal of indictment). Wenger has not sought exclusion, and the Court lacks sufficient information to determine whether exclusion is appropriate.

**G.    Wenger Fails to Demonstrate Whistleblower Retaliation.**

Wenger argues that the prosecution against him is the result of retaliation for exercising his constitutional right to free speech. (Mot. at 11:11-12.) Wenger claims that the prosecution treated him differently than other officers who engaged in more egregious conduct and who were not charged because of his whistleblowing activity.

**1.    The Government Has Broad Discretion in Charging Decisions.**

The Court starts with an acknowledgement that the Government, not the Court, has near-total discretion to determine who to prosecute and for what crimes. "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Charging decisions fall within a "special province" of the Executive Branch. *United States v. Armstrong*, 517 U.S. 456, 463–64 (1996) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). Ordinarily, a finding of probable cause is sufficient to support the presumption that a prosecutor acted properly in bringing charges. *Id.* at 464.

A defendant who seeks to examine the motives behind his prosecution thus faces a demanding burden. The defendant must show by "clear evidence" both a "discriminatory effect" and "discriminatory purpose." *Id.* at 465. "Specifically, the defendant bears the burden to 'demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive.' " *United States v. Rundo*, 108 F.4th 792, 798 (9th Cir. 2024) (quoting *United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007)). The Court views all evidence in the light most favorable to the Government. *Id.* at 799.

United States District Court
Northern District of California

**2.    Wenger Fails to Demonstrate Any Connection Between Protected Speech and This Action.**

Wenger does not identify any whistleblowing activity or disparate treatment in his motion. (*See generally*, *id.*)  Courts are not "pigs[] hunting for truffles buried in briefs."  *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Moving parties are responsible for clearly setting forth argument and evidence, and counsel for Wenger has failed to do so.  However, in an effort to be as comprehensive as possible in this Order, the Court considers other filings from Wenger in addressing this claim.

In his motion seeking leave to file the instant motion, Wenger claimed that he "spoke out against the racist behavior of Officer Rombough."  (Dkt. No. 181, Mot. for Leave, at 9:14-15.)  Wenger provides no support for this assertion, such as a declaration as to the timing, means, manner, or content of that alleged speech.  He does not claim that the Government was aware of his purported speech.  Nor does Wenger explain how objecting to the conduct of a co-defendant could have resulted in being charged alongside that co-defendant in the -269 case.  At most, Wenger argues that there was a comparative "absence of racially derogatory content in Wenger's messages," not a presence of affirmative speech against the racist messaging.[6]  (Dkt. No. 186, Mot. to Reconsider Mot. for Suppression and Mot. for *Franks* Hr'g, at 17:25-26.)

Wenger includes somewhat more detail regarding alleged retaliation in his Motion to Reconsider the Motion for Suppression and Motion for *Franks* Hearing.  (*See id.*)  Wenger claims that he testified in a July 2021 interview with an External IA Investigator regarding Lieutenant Robert Meads' alleged abuse of the California Law Enforcement Telecommunications System.  (*Id.* at 18; Dkt. No. 186-1, Declaration of Devon C. Wenger ("Wenger Decl."), ¶ 8.)  Wenger contends that, after his IA testimony, Meads filed "a retaliation IA against Wenger which subsequently led to Wenger's resignation and resignation letter resulting in a retaliation-based Count 8."  (Mot. to Reconsider Mot. for Suppression and Mot. for *Franks* Hr'g, at 10:1-3.)

This argument lacks merit.  Wenger has not demonstrated a connection between internal

---

[6] The Government contends, in turn, that it seems unlikely that Wenger spoke out against Rombough given Wenger's own use of derogatory language.  (Dkt. No. 191, Opp. to Mot. to Reconsider, at 22 n.10 (quoting Wenger as texting "Lets get faggot ass [lieutenant] something to stress out about lol" and calling "body cams" "gay and useless").)

1    investigations within the Antioch Police Department and the instant action. *See United States v.*

2    *Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981) (holding that "involvement of separate sovereigns

3    tends to negate a vindictive prosecution claim," i.e., where a federal prosecution follows assertion

4    of rights in a state prosecution). Meads is not an FBI agent, and Wenger sets forth no logical

5    reason why Meads' purported grudge against Wenger would lead to an investigation by the FBI

6    (or even the Contra Costa County District Attorney) into Wenger. Indeed, the federal warrants

7    suggest that Wenger was not an initial or even second-round target of the probe: it was only after

8    the FBI agents discovered Wenger's participation in text exchanges with Harris that Inspector

9    Wallace sought and obtained a warrant for Wenger's cell phone. (*See* May 19, 2023 Search

10   Warrant, Ex. 1, State Warrant, at DCW-000076-78 (attesting belief that Wenger was purchasing

11   anabolic steroids from Harris due to Wenger's messages such as "I need some test or growth shit

12   in my life" and that he is "stoked to be here bro [in the anabolic club]").) Wenger was not

13   investigated for potential civil rights violations until after the FBI had reviewed Amiri's iCloud

14   account and located concerning texts from Wenger. (*See, e.g.*, May 19, 2023 Search Warrant, ¶¶

15   15, 23 (celebrating the use of a police canine on one suspect and suggesting that they "beat [the]

16   fucking ass" of another suspect after work).)

17        Wenger further alleges that he spoke out against Antioch Police Department Captain

18   Anthony Morefield for supporting Meads' retaliatory IA investigation, and that the investigation

19   into Wenger constitutes retaliation for that speech. (Mot. to Reconsider Mot. for Suppression and

20   Mot. for *Franks* Hr'g, at 18:24-19:4.) According to Wenger, he disclosed his concerns regarding

21   Captain Morefield to his own attorney Julia Fox on March 3, 2022.[7] (Wenger Decl., ¶ 9.) Wenger

22   contends that there is a causal relationship between this alleged whistleblowing complaint and the

23   issuance of the state court warrant because, in the affidavit in support of the state court warrant,

24   Inspector Wallace states that Special Agent Templin provided him with confirmation of Wenger's

25

26   _____

27   [7] Wenger does not contend that anyone else was present for this interview, and he does not state
     that Ms. Fox did anything with the information, such as filing a complaint on Wenger's behalf for
     retaliation. It is unclear whether anyone at the United States Attorney's Office, the FBI, or the
28   Contra Costa County District Attorney's Office was privy to the content of Wenger's conversation
     with Ms. Fox.

1    phone number via a subpoena on the same day that Wenger spoke to Ms. Fox.  Because the

2    Government has since conceded that there was no subpoena, Wenger contends the investigation is

3    "fabricated" and "orchestrated" to target Wenger.  This argument is nonsensical.  The only

4    connection between the IA investigation and Inspector Wallace's investigation is that two

5    unrelated activities happened on the same date in both investigations.  Inspector Wallace's

6    mistaken belief that Wenger's phone number was confirmed via a subpoena has no plausible

7    connection to Wenger's supposed whistleblowing on Captain Morefield.  It certainly does not rise

8    to "clear evidence" of unlawful intent.  *See Rundo*, 108 F.4th at 798-99 (noting the "particularly

9    demanding" standard required to prove selective prosecution).

10    Wenger claims he next "blew the whistle" on Captain Morefield on June 5, 2022, when

11    Wenger confronted Morefield in front of two Human Resources employees and accused Morefield

12    of retaliation for Wenger's testimony against Meads.  (Mot. to Reconsider Mot. for Suppression

13    and Mot. for *Franks* Hr'g, at 21:22-27.)  He claims, without support, that following this

14    "whistleblowing," "the FBI intensified its case (and sought their subsequent indictment) against

15    Mr. Wenger."  (*Id.* at 22:5-11.)  Even if Captain Morefield and the Antioch Police Department's

16    Human Resources team communicated this confrontation to the FBI, the first federal warrant was

17    too remote to have any logical connection to Wenger's speech.  The FBI obtained the first federal

18    warrant in May 2023, nearly a year later.  And, again, the federal warrants for Wenger's cell

19    phone were supported by lawful searches into the phones of other officers, including Amiri and

20    Harris, not communications between Wenger and Meads or Morefield.

21    Finally, Wenger contends he engaged in protected speech by giving a statement to ABC

22    News.  In that statement, Wenger asserted that the investigation into the Antioch Police

23    Department was "corrupted" and "that there was much the public was unaware of regarding the

24    retaliatory nature of the case."  (*Id.* at 21:7-11.)  Wenger contends that the FBI "appeared to

25    escalate its actions" against him following his interview, including by Special Agent Kular

26    seeking and obtaining a second warrant for Wenger's phone data.  (*Id.* at 21:11-12.)  This

27    argument, too, is flawed.  First, the Court cannot consider the timing or content of the ABC

28    interview because Wenger does not provide it, nor any citation to record supporting that the

15

interview in fact occurred.  Second, Wenger's argument is purely speculative: he contends the FBI "appeared to escalate" its investigation, but he offers no basis whatsoever for this contention.  (*Id.*)  Each successive warrant sought and obtained by the FBI was supported by probable cause, and none mentioned public statements by Wenger to ABC News.

Even if Wenger had demonstrated some connection via timing between the ABC News interview and an escalation in enforcement actions against him, the Ninth Circuit "ha[s] never held that the timing of prosecutions is suggestive of improper motive."  *Rundo*, 108 F.4th at 805.  A finding to the contrary in this context would suggest that suspects may insulate themselves from indictment by merely speaking out about their actions, beliefs, or investigations into their conduct.  *See id.* (noting that "if referring to the facts of a case were enough to raise an inference of a discriminatory motive, then the government would never be able to prosecute an individual who has committed a crime, and whose ideology was one of the motives . . . behind the crime.")

In sum, Wenger has failed to make a facial showing that this action is tied to any whistleblowing activities or protected speech.

### 3.    Wenger Fails to Show Different Treatment of Similarly Situated Officers.

"The point of the 'similarly situated' analysis is to 'isolate the factor allegedly subject to impermissible discrimination.' "  *Rundo*, 108 F.4th at 799 (quoting *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989)).  Wenger needed to produce evidence that other officers engaged in the same conduct charged, but that they did not engage in the same whistleblowing behavior and did not face prosecution.  Wenger contends that other officers were "involved in more egregious conduct but not similarly charged."  (Mot. at 11:9.)  Wenger's motion is bereft of supporting argument or facts.

The Court again looks to Wenger's Motion to Reconsider the Motion for Suppression and Motion for *Franks* Hearing.  In that filing, Wenger asserts that Meads, Sergeant Evans, and Officer Mayer should have been charged with federal crimes but were not.

Wenger contends that Meads was charged with a misdemeanor in February 2022 in connection to unauthorized access to sensitive information.  Wenger provides no supporting source for this contention other than his own alleged knowledge.  (*See* Wenger Decl., ¶ 8.)

1    Wenger provides no reason why he and Meads were similarly situated or why Meads' seemingly

2    unrelated state charges have any bearing on the United States' charges against Wenger.

3            Wenger next argues that retaliation is evident because Evans and Mayer were both

4    involved with the incident identified in Count 8 of the -269 action.  Wenger allegedly shot a

5    suspect with a 40mm less lethal launcher in the chest, an area which Wenger was trained to avoid

6    because of potential lethality.  Evans allegedly kicked the suspect in the upper torso after the

7    suspect was under control and on the ground.  Mayer allegedly mauled the suspect with his police

8    canine.  Wenger contends these actions are visible on body camera recordings.[8]  Wenger and

9    Mayer were investigated by IA, but Evans was not.  (*See* Dkt. No. 191-15, Gov't Ex. 14, Antioch

10   Police Department K9 Utilization Report, at DCW-000466.)  Only Wenger is charged in the -269

11   action related to this incident.

12           Wenger points to racist text messages allegedly sent by Evans in which Evans uses the n-

13   word, agrees that he is "racist," laments that bruises do not show up well on Black skin, and is told

14   by Rombough that he needs to stop kicking "[n-word]s in their head."  (Mot. to Reconsider Mot.

15   for Suppression and Mot. for *Franks* Hr'g, at 16:23-17:15.  Wenger does not cite to a document

16   with these messages, but they are included in Dkt. No. 230-3, Exhibit D, Investigation Report, at

17   7, 14, 17.)

18           Wenger does not allege that Mayer sent or received any racist text messages.  He does not

19   explain the content or outcome of the IA investigation into Mayer's use of force with his police

20   canine.  Nor does he provide any information regarding alleged whistleblowing (or lack thereof)

21   on the part of Evans or Mayer.

22           The Government contends that Evans and Mayer were not similarly situated to Wenger

23   because Wenger's use of force was more serious and because Wenger's texts "demonstrate. . . [a]

24   pattern of engagement and intent" whereas Evans' demonstrate "generalized racial animus."

25   (Opp. to Mot. to Reconsider, at 24:25-27.)  The Government otherwise responds that Wenger

26   failed to produce "clear evidence" regarding disparate treatment.

27

28   _____

[8] Wenger does not provide a copy of the recordings for the Court's review.

United States District Court
Northern District of California

1    The Court agrees with the Government.  While Evans' messages are egregious and the

2    Court does not condone his alleged conduct, the Government is entitled to a "presumption of

3    regularity" in its charging decisions.  *Rundo*, 108 F.4th at 808.  Neutral reasons to prosecute

4    Wenger and not Evans or Mayer exist, including the Government's belief in the strength of its

5    case.  Moreover, as explained above, Wenger has not shown that he engaged in protected activity

6    against which the Government has retaliated.  Wenger has not met his high evidentiary burden to

7    dispel the presumption of regularity.

8    **H.    Wenger Does Not Demonstrate Ineffective Assistance of Counsel.**

9    Wenger next asks that the -269 case be dismissed for ineffective assistance of counsel on

10   behalf of his prior attorneys, Candice Fields and David Fischer.  According to Wenger, his former

11   attorneys were constitutionally deficient because they (i) "did not review substantial evidence of

12   retaliation" against Wenger; (ii) withheld discovery materials from Wenger; and (iii) engaged in

13   plea negotiations without Wenger's consent.  These allegations do not support dismissal of the

14   charges against Wenger.

15   Counsel is constitutionally deficient if (1) "counsel's representation fell below an objective

16   standard of reasonableness"; and (2) the counsel's errors "actually had an adverse effect on the

17   defense."  *Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984).  As Wenger acknowledges,

18   "without showing prejudice[,] counsel is not constitutionally ineffective."  (Mot. at 12:16-17.)

19   Disagreement in strategy between current and former counsel does not equate to ineffective

20   assistance.  *See Harrington v. Richter*, 562 U.S. 86, 106 (2011) (reversing grant of habeas where

21   attorney forewent defense avenue and noting, "[t]here are . . . 'countless ways to provide effective

22   assistance in any given case. Even the best criminal defense attorneys would not defend a

23   particular client in the same way.' ") (quoting *Strickland*, 466 U.S. at 689).

24   Assuming for the sake of argument that any of the issues Wenger raises are in fact so

25   egregious as to render the prior counsels' assistance unconstitutionally poor, Wenger's argument

26   fails because he has not shown prejudice.  Trial is months away, and Wenger has new counsel

27   with whom he is presumably more aligned on strategy.  Wenger's counsel is capable of sharing

28   requested materials with Wenger (within the bounds of the relevant protective orders) and

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1  respecting his wishes regarding plea negotiations.  Current counsel moved to dismiss on the basis

2  of unlawful retaliation well in advance of trial.  There are no proceedings the outcome of which

3  may have differed with current counsel.[9]

4  **I.    Additional Issues Raised in Reply Do Not Warrant Dismissal.**

5        Wenger raises additional arguments in his reply brief that the warrants nevertheless run

6  afoul of the Fourth Amendment because they are overbroad, based on misleading reports, and

7  were executed beyond their scope.  These arguments were not raised in the motion to dismiss and

8  may not be raised for the first time on reply.

9        Even if the Court were to consider the arguments on the merits, Wenger's threadbare

10  arguments fail to make the necessary showing that the warrants violated the Fourth Amendment.

11  The Court addressed Wenger's more fulsome concerns in its order denying Wenger's motion to

12  suppress and motion for a *Franks* hearing.  (*See* Dkt. No. 180.)  It briefly addresses Wenger's new

13  arguments here.

14        **1.    The Warrants Were Not Overbroad.**

15        Wenger contends that the state and federal warrants were general searches in violation of

16  *Marron v. United States*, 275 U.S. 192 (1927) and *Riley v. California*, 573 U.S. 373 (2014).  Once

17  again, Wenger provides no pin citations to case law or citations to the record in support of his

18  motion.  Out of an abundance of caution, the Court considers the July 23, 2023 warrant.

19        A search warrant is sufficiently particular if it "sets out objective standards by which

20  executing officers can differentiate items subject to seizure from those which are not," provided

21  the government was not "able to describe the items more particularly in light of the information

22  available to it at the time the warrant was issued."  *United States v. Spilotro*, 800 F.2d 959, 963

23  (9th Cir. 1986).  Even if the warrant seeks generic categories of evidence, "[r]eference to a

24  specific illegal act can, in appropriate cases, provide substantive guidance for the officer's exercise

25  of discretion in executing the warrant."  *Id.* at 964.  The particularity requirement prohibits "the

---

[9] Wenger does not argue that his current counsel is deficient, nor could he.  Counsel has zealously and vociferously defended her client, including by filing eight motions to suppress, dismiss, or reconsider (meritorious or otherwise) in the last three months.

1    seizure of one thing under a warrant describing another." *United States v. Cardwell*, 680 F.2d 75,

2    77 (9th Cir. 1982) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).  In *Riley*, the

3    Supreme Court noted the particular care which must be given to privacy concerns when officers

4    search personal cell phones without a warrant.  573 U.S. at 385.

5         The July 2023 warrant permitted the FBI to search "information associated with the

6    personal cellular telephone (and its forensic image) of Antioch Police Officer Devon WENGER. .

7    . originally seized by the Contra Costa County District Attorney's Office pursuant to a state search

8    warrant executed on March 23, 2022."  (Dkt. No. 193-2, November 4, 2024 Warrant, Exhibit 1,

9    July 23, 2023 Warrant, Attachment A.)  Law enforcement was authorized to seize "records. . .

10   from the time period of January 1, 2019 to March 23, 2022 that relate to violations of 18 U.S.C. §

11   241 (conspiracy against rights), 18 U.S.C. § 242 (color of law), and/or 21 U.S.C. § 846

12   (conspiracy to distribute controlled substances) since, including" five categories of evidence.  (*Id.*,

13   Attachment B.)  The categories were cabined by the introductory paragraph and guided law

14   enforcement's examination of Wenger's data.  This was sufficiently specific.

15        **2.    Agent Gauthier's Reports Are Irrelevant.**

16        Wenger argues that the search warrants were supported by "misleading reports" and

17   "speculative assertions" by Agent Rodney Gauthier regarding the scope of Wenger's involvement

18   in the alleged steroid scheme.  (Reply, at 5:26-28.)  Agent Gauthier and his alleged reports were

19   not cited in any of the warrants pertaining to Wenger.  (*See generally*, Dkt. No. 193-2, November

20   4, 2024 Warrant (attaching previous warrants relating to Wenger).)  Wenger does not provide clear

21   citations to reports from Agent Gauthier, and he does not explain how those reports could have

22   misled the Magistrate Judge.[10]

23

24   [10] Wenger cites to an "Exhibit B" at "US-000217" and an "Exhibit C" at "US-000841" to support
     an assertion that "Agent Rodney Gauthier's report explicitly referenced data seized during the
25   state investigation."  (Reply, at 3:1-2.)  Wenger did not attach any lettered exhibits to his Reply, so
     the Court assumes that Wenger intended to refer to Exhibits 2 and 3, respectively.  Exhibit 2 is an
26   evidence log which starts at page US-000222.  (Dkt. No. 227-2.)  The log shows that Agent
     Gauthier checked out Wenger's phone to release the phone to the Contra Costa County District
27   Attorney.  (*Id.* at US-000227.)  It contains no analysis or assertions regarding Wenger's role in the
     alleged scheme.  (*See generally*, *id.*)  Exhibit 3 is a document labeled "(U) Document Return of
28   Federal Search Warrants Pertaining to This Case."  (Dkt. No. 227-3, at US-000841.)  Wenger is
     not mentioned in the document.  (*See generally*, *id.*)  No other documents purporting to be "Agent

United States District Court
Northern District of California

United States District Court
Northern District of California

### 3.    Wenger Fails to Demonstrate that the Government Exceeded the Scope of the Warrants.

Wenger claims that "[t]he government exceeded the scope of the warrants by accessing deleted messages, private communications, and irrelevant data."  (Reply, at 6:7-8.)  More specifically, according to Wenger, the Government overstepped by seizing data "allegedly pertaining to destruction of evidence which was outside the scope of any warrant and was then used to indict Mr. Wenger."  (*Id.* at 6:12-14.)

This argument lacks merit.  Wenger fails to identify any improperly seized data which contributed to his indictment.  As in previous orders, it is well-settled that law enforcement may scoop up large amounts of electronic data and then segregate relevant data in a multi-step process. (*See* Dkt. No. 158, Order Denying Defendant Amiri's Motions to Suppress, at 11-12.)  The July 24, 2023 warrant permitted law enforcement to examine Wenger's data for "[r]ecords reflecting or relating to co-conspirators, including personal notes, correspondence, cables, personal address lists, listings of telephone numbers, and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates and co-conspirators," as well as evidence "showing who used or owned the device associated with the Target Data at the time the things described in this warrant were created, edited, or deleted, such as logs. . . and browsing history."  (November 4, 2024 Warrant, Ex. 1, Attachment B [DCW-000833].)  "Deleted messages" and "private communications" fall into this category.

Moreover, the November 4, 2024 warrant authorizing additional searches relating to the destruction of evidence did not rely solely on deleted messages recovered through forensic software.  The agents noticed that messages lawfully found in other officers' data and sent to Wenger were missing from Wenger's phone.  (*See id.*, ¶ 12 [DCW-000797].)  The agents observed, for example, that the exchange between Harris and Wenger regarding a USPS package found to contain steroids was present on Harris's phone and not present on Wenger's phone.  (*Id.* ¶¶ 13-14.)  Thus, even if the Court were to agree that the FBI overstepped by examining Wenger's

---

Gauthier's reports" were provided to the Court.  It is unclear what about these reports is false or misleading, or why the Court should consider the reports when determining the validity of the warrants if the reports were not provided to the Magistrate Judge prior to issuance.

deleted messages through forensic software, striking those messages from the November 4, 2024 warrant application would still leave probable cause to believe that evidence of destruction of evidence could be found in Wenger's data.

**J.    The Court Denies Wenger's Request for a Change of Venue.**

As an alternative to dismissal, Wenger seeks a change of venue. Wenger contends that the City of Antioch, the Antioch Police Department, the Contra Costa County District Attorney, and the Mayor of Antioch have issued public statements regarding the case and that, presumably, Wenger is thereby prejudiced.

The Sixth Amendment provides that criminal defendants shall be tried by an impartial jury in the state where the alleged crime was committed. U.S. Const. amend. VI. The right to be tried in the state where the crime was allegedly committed belongs to the defendant and may be waived by him "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.' " *Skilling v. United States*, 561 U.S. 358, 377–78 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). District courts must transfer proceedings at a defendant's request "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Civ. P. 21(a).

A moving defendant must establish "actual" or "presumed" prejudice to obtain transfer. *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018). Wenger does not (and could not, at this stage in the proceedings) contend that "actual" prejudice has infected any seated jurors.

Prejudice may be presumed only in the "extreme case." *Id.* The Supreme Court has observed that "informed citizens who are 'best fitted' for jury duty" will almost certainly know of "notorious crimes." *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (quoting *Reynolds v. United States*, 98 U.S. 145, 155–156 (1879)). Thus, "prominence" of a case in the press "does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (2010) (emphasis in original). "Ordinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination," not by pretrial motions. *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996).

Several non-exclusive factors guide lower courts in determining whether presumed

United States District Court
Northern District of California

prejudice is so extreme as to warrant venue transfer before voir dire: (1) the "size and characteristics of the community in which the crime occurred"; (2) the extent to which the publicity is prejudicial, such as the broadcasting of a confession or "other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) the length of time between the alleged crime and the trial. *Skilling*, 561 U.S. at 382-83.

Wenger has not made a showing that fair trial would be impossible due to pretrial publicity. Wenger points to a non-exclusive list of eight articles on the investigations into Pittsburgh and Antioch police officers generally, only two of which mention Wenger by name. (*See* Dkt. No. 190-2, Declaration of Nicole Castronovo, Ex. 1.) The Government, in turn, points out that Wenger's counsel recently issued a press release in the Antioch Herald setting forth the defense theory of the case. This is simply not the "saturation" of the community with prejudicial information which merits change of venue.

Consider, for example, *McVeigh*, which Wenger cites for the proposition that prejudice may be presumed even outside of extreme cases. (Mot., at 15:16-19.) *McVeigh* involved the trial of Timothy McVeigh, who famously bombed the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, resulting in the deaths of at least 168 people. 918 F. Supp. at 1469. *McVeigh* itself involved the "extreme case" in which venue transfer was warranted, although the court did not use that exact phrase. *Id.* at 1470. Among other things, the court noted that "[a]ll of the Oklahoma television markets have been saturated with stories" regarding the defendants and victims. *Id.* at 1472. Crowds surrounded the defendant upon arrest and shouted "murderer" and "baby killer," and those crowds were themselves broadcasted. *Id.* at 1471. The Governor of Oklahoma termed the sense of unity in the state following the attack, "The Oklahoma Standard." *Id.* at 1471. Books, pamphlets, newspapers, films, novelty license plates, t-shirts, teddy bears, images of angels, purple ribbons, and even the state Christmas tree displayed sympathy for the victims months after the attack. *Id.* at 1471-73. The publicity identified in the instant case—eight articles, many of which do not mention Wenger by name—simply does not approach the level of publicity at issue in *McVeigh*.

*Skilling* is likewise informative. That case involved the trial of an Enron executive who

sought to transfer venue away from Houston.  561 U.S. at 369–70.  Thousands of Houston residents had lost their jobs and retirement savings as a direct result of Enron's collapse, and many more Houstonians had suffered from "spillover economic effects." *Id.* at 375-76.  The defendant retained experts who provided evidence regarding hundreds of news reports as well as prevailing hostile sentiments toward the defendant. *Id.* at 369-70.  The Supreme Court nevertheless found that the district court did not err by declining to transfer venue. *Id.* at 368.  The showing of negative pretrial publicity attempted by the defendant in *Skilling* eclipses Wenger's showing of eight news articles here, and yet was insufficient to merit transfer. *See Schriro*, 882 F.3d at 802 (citing *Skilling* and noting that juror exposure to "pervasive, adverse publicity[] is not enough alone to trigger a presumption of prejudice to the defendant's due process rights.").

Accordingly, the Court declines to transfer venue.

## CONCLUSION

For the foregoing reasons, Wenger's motion to dismiss or to transfer venue is DENIED.

**IT IS SO ORDERED.**

Dated: January 3, 2025

_____
JEFFREY S. WHITE
United States District Judge