CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ALETHEA M. SARGENT (CABN 288222)
ALEXANDRA SHEPARD (CABN 205143)
Assistant United States Attorneys

   1301 Clay Street, Suite 340S
   Oakland, California 94612
   Telephone: (510) 637-3680
   FAX: (510) 637-3724
   Alethea.Sargent@usdoj.gov
   Alexandra.Shepard@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 23-CR-00269-JSW-3 |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL |
| v. | |
| DEVON CHRISTOPHER WENGER, | |
| Defendant. | |

The Court should deny Defendant Devon Wenger's motion for a judgment of acquittal on Count One because the government has presented extensive evidence that Wenger participated in a conspiracy to use excessive force on the citizens of Antioch.

### I.    Legal Standard

When considering a motion for acquittal under Federal Rule of Criminal Procedure 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This Court's "function . . .

is quite narrow" because it is the "jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflict and draw reasonable inferences from proven facts." *United States v. Bernhardt*, 840 F.2d 1441,1448 (9th Cir. 1988) (citation omitted). Circumstantial evidence and reasonable inferences drawn from that evidence alone are sufficient to sustain a conviction. *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

## II. The Government Has Presented Sufficient Evidence to Support a Conviction on Count One (18 U.S.C. § 241, Conspiracy Against Rights)

A rational trier of fact could conclude that Wenger conspired to violate the civil rights of the very people he was sworn to protect. Wenger knowingly joined an existing agreement between fellow Antioch Police Officers Eric Rombough and Morteza Amiri to use excessive force with undeterred and continue to use excessive force. The evidence shows that the co-conspirators conspired to join together to look for and even create opportunities to use excessive force; to proactively encourage one another in future uses of excessive force; to not intercede in one others' uses of force unless it was necessary to protect the officer; and to falsify police records as necessary to ensure that they could continue using excessive force without sanction.

The conspiracy between Amiri, Rombough, and Wenger had several discrete objects. One was to impose extrajudicial punishment. In Wenger's own words, "[t]hat's what fucking happens when you run, you acquire a tax." Exh. 255, p. 70. Another was enjoyment, which they expressed freely in their communications as they planned to use excessive force or wrote about it afterwards. Rombough testified to still another object: advancing in the department. He testified that "[w]hen I started using force, I began to get noticed at the P.D." Tr. at 502. Wenger, after shooting D.S., told Amiri that he was "just trying to get on SWAT." Exh. 103, p. 295. Another object, discussed in more detail below, was to conceal what they were doing in order to keep doing it.

Importantly, the jury need not fine that any particular use of force was, in fact, excessive. This is because conspiracy to commit a crime "does not require completion of the intended underlying offense." *United States v. Iribe,* 564 F.3d 1155, 1160-61 (9th Cir. 2009). Put plainly, the agreement is the crime. Although there's no requirement that co-conspirators actually carry out an agreement, there is abundant evidence that the co-conspirators did more than just text: they went out and used excessive

force in the community.

Like many conspiracies, this was not an agreement which was signed or even discussed in specific terms. But the methods of the conspiracy were so antithetical to the work of a police officer that they are inexplicable in the absence of an understanding between the officers to act. *See United States v. Gonzalez*, 906 F. 3d 784, 792 (9th Circuit 2018) (an agreement to use excessive force can be tacit or implied; it does not need to be express).

### A. The evidence is sufficient to show that there was an agreement between two or more people to use excessive force.

Eric Rombough's testimony and the exhibits he put in prove the conspiracy between himself and Morteza Amiri. Rombough testified that, after he came to APD, he acquired a certain view of the individuals he policed, both people who made reports and suspects, seeing them as "numbers." *See, e.g.*, Tr. 500. He came to see calls for help as a waste of time and suspects as not deserving of rights. *Id.* He came to resent their rights. *Id.* During the COVID lockdown, this sense increased as he saw people let off for crimes; he came to see his brutality as their punishment. *Id.* at 501. He came to relish the fact that he was delivering punishment and to take pleasure from the violence. In his view, for example, tasing was not the same as "beating" a suspect's "ass" because "once the taser is done and he's in custody, it's over." Tr. 634.

Rombough knew that Morteza Amiri shared these views; Amiri was his most trusted confidante. *See, e.g., id.* at pp. 510. Rombough even testified to a specific text message in which he and Amiri discussed violating civil rights. *See* Ex. 102, at p. 2188. Although there is no requirement that co-conspirators actually carry out an agreement, Rombough's testimony demonstrates that these were not jokes; he described in depth times in which he went out and exacted punishment on criminal suspects in Antioch, and he testified that Amiri planned with him, joined him, applauded him, and covered up for him.

The evidence shows they planned. On July 28, 2020, writing to Rombough about a local with criminal history named M.C., Amiri said: "I was hoping we could set up a dog bite and fuck him up." Ex. 102, at p. 2363. Rombough replied: "Ok bro. I'm gonna try to catch him rolling." *Id.* The evidence shows that this plan was serious: as discussed later, Amiri *did* catch him about a month later

with Wenger, and one of the two delivered unreported face punches. *See* Exh. 255, at pp. 66-67 & 141-143; *see also* Exh. 257 (photo of injury).

The evidence shows that, at times, they joined one another. Rombough testified that he was present with Morteza Amiri at his first bite on or around March 9, 2019, when Amiri was so anxious for a bite that he chased an individual whose identity he had mistaken and then forced his K-9 Purcy onto the suspect's leg. Tr. at 613. Amiri was excited that he got his first bite but "nervous it wasn't the person he thought it was." Amiri told Rombough: "I hope the bike is stolen or this person is on probation." Tr. 614.

The evidence shows that they also applauded one another. During the week Amiri referenced to Wenger as "a very eventful work week," Rombough texted Amiri: "Brah you've been killing it." Ex. 102, at p. 2485.

And the evidence shows they covered up for one another. For example, Rombough testified about a suspect named B.S., who (after texting Amiri, "let's find something good tonight," Ex. 102, p. 546) he chased and caught on a night he was working with Amiri. Tr. 649-651. Rombough delivered blows after B.S. was handcuffed, and Amiri saw him. Amiri only stopped Rombough because a sergeant who was not yet trusted, Sgt. Hoffman, was approaching. *Id.* at p. 650. And Rombough reciprocated. On August 5, 2021, about an incident at which they were both present, Amiri texted Rombough: "but do me a solid. don't face me and record my coo sniffs on bwc. it will open the door for defense to criticize the alert. my angle doesn't get it all." Exh. 102, at p. 3771. Rombough responded: "I got you. I'll [p]osition myself a little diff next time. I didn't want you to get ran over by him. I was gonna smoke him." Ex. 102, at p. 3773. Rombough explained that text in his testimony: "If there was a body-worn camera, it would actually capture the incident or him giving the dog a command versus what would be written in the report. If there was no body-worn camera, then he could write whatever he wanted on how the dog alerted." Tr. 644.

As noted above, the government does not need to provide that the conspirators had a signed agreement or even a precise discussion of terms. Nevertheless, the actions to which Rombough testified are so inconsistent with and even antithetical to normal policing, as exemplified by the testimony of Captain Morefield and the policies in evidence, that they are inexplicable in the absence of agreement.

**B.     The evidence is sufficient to show that Wenger joined in the agreement knowing of its purpose and intending to help accomplish it**

**1.     The moment of joining**

The evidence shows that by the early morning hours of April 21, 2019, Wenger joined the agreement, knew what it was about, and wanted to help accomplish it.

A set of interlocking text messages between Amiri and Rombough; Amiri and Wenger; and all three together; show how this played out. On April 20, 2019, at 3:40 Wenger texted Amiri and asked him for Rombough's telephone number. Ex. 103 at p. 26. At 5:19 p.m., Amiri said he'd been asleep and sent back a file titled Rombough.vcf. *Id*. At 7:02 p.m., Wenger told Amiri, "No worries dawg." At 7:12, Wenger texted both Amiri and Rombough:

> Hey guys its Wenger, so first of all I fucking love you guys. . .So last night JP talked to me about a priority 3 call in 6 that was pending for a while when he logged in. I don't know what happened but I guess somebody was thinking that Prieto and I were call dodging. Normally I would Not give a shit what people think but I really like you guys and I don't want to you to have a negative opinion of me over some bullshit. . .I want to let you guys know that I would not avoid a paper call like some other fuck faces do. . . Thanks dudes, again I'm only texting you two because I like you guys and I sincerely care what you think. If anything like this happens again please let me know. I know how bad opinions of people can spread like wild fire here.

Exh. 107 at 1.

At 7:26, Amiri texted just Wenger to say that they would "98," or meet in person, later. Exh. 103 at 27. Wenger responded "Cool," but then asked: "What did I do wrong though? If I fucked up let me know so I can fix the deficiency." Exh. 103 at 28. Amiri responded at 7:40 and told him he was "good," and said, "[I] prefer to talk in person instead of text so things don't get misunderstood since there is confusion lol." Exh. 103 at 28. Rombough then wrote to both Wenger and Amiri at 7:42 and virtually the same thing what Amiri advised Wenger: "I'll 98 with you when I log on," and that he would "catch u in a bit." Exh. 107 at 2. A few minutes later Amiri wrote to Rombough, "[I] told him the same thing as soon as he sent that." Exh. 102 at 313.

The evidence does not confirm whether in fact they had the promised in-person conversations later that evening. However, within a few hours after their last group text, Wenger sent a different kind of text message. This text message requested that Rombough and Amiri use force against a particular

person who, he claimed, had run, and he included the suspect's photograph and booking information. What he said specifically, at 12:49 a.m. on April 21, was: *"Please find this guys and fuck him in the ass."* Exh. 107 at 3 (emphasis added). Rombough wrote back a few seconds later, "Deal." *Id*. A few seconds after that, Wenger texted Amiri and Rombough the photo and wrote, "He's the fuck face that ran. Wants are 108 and 2800." Exh. 107 at 4; Tr. at 661. And Amiri, the K-9 handler, responded about 40 minutes later, "[I]ll bite em." Exh. 107 at 5. Rombough testified that 108 refers to a stolen vehicle and 2800 refers to "evading." Tr. at 661. He also testified that he took Amiri's statement that he would "bite em" seriously based on their relationship. Tr. at 662-63.

### 2. Wenger knew the purpose of the agreement

The government acknowledges that Wenger will contend that the above messages and others like them were simply a joke. However, the fact that he knew the purpose of the agreement, to use excessive force, and to continue using excessive force, is evident in Wenger's words and actions.

Two of the incidents from the "very eventful work week" from August 20 to August 24, 2020 provide the clearest example that Wenger knew the purpose of the agreement, and that he intended to help accomplish that purpose.

On August 21, Wenger, Amiri, and Amiri's K-9 Purcy assisted the neighboring Pittsburg Police Department with tracking car theft suspect J.A. The incident was captured by a Pittsburg Police Officer's body-worn camera ("BWC"). Before they began tracking, Amiri can be heard asking the Pittsburg officer to let him know when the officer was "hot." Exh. 302. Lieutenant William Hatcher of the Pittsburg Police Department testified that he understood "hot" to mean "running;" that is, that the BWC was on. Tr. at 863. The Pittsburg officer informed Amiri immediately that he was "hot right now." Exh. 302; Tr. at 861. Together, they tracked J.A. to a stand of bushes, from which K-9 Purcy dragged him out. The incident was captured on the Pittsburg body cam, which was admitted as Exhibit 302.

Later that night, Amiri and Wenger texted about what they would have done if the cameras weren't hot. Amiri texted Wenger, "if pitt didn't have all those body cams and that was us... we would have fucked him up more. he didn't get what he deserved." Wenger responded, "I agree. That's why I don't like body cams." Exh. 255, pp. 61-64. By asserting that he and Amiri would have used more force

than was necessary to detain J.A. without body cams, Wenger effectively asserts that without body cam they would have used excessive force.

The evidence shows that the next night, Wenger clearly understood what happened when the cameras weren't hot. After tracking car theft suspect D.R. to a tent in a homeless camp, Amiri let his K-9 Purcy loose. He wrote later that night to Wenger, "bro we saw him laying in bed just acting like he was asleep. i walked out the tent and game planned how to fuck him up. went back and did justice. wish you were there. inside a tent with no cams... you would have loved it. oakley agreed to keep cameras off." Wenger wrote back, "Bro...fuuuuuuck yes!!! Fuck that nerd!! That's what fucking happens when you run, you acquire a tax. His tax was paid properly! Good shit bro."

### 3. Wenger intended to help accomplish the purpose

The evidence of Wenger's actions vis a vis Amiri also demonstrate that he intended to help accomplish the purpose. A single example may suffice to show this, given the striking proximity of text messages to initiation of suspect encounter and the subsequent falsification involved. As noted above, Amiri and Rombough had exchanged text messages about M.C. in July of 2020, in which they made plans to catch M.C. and "set up a dog bite and fuck him up." Exh. 102, at p. 2362. But the evidence shows Amiri and Rombough didn't catch M.C.; Amiri and Wenger did.

On August 22, 2020, at 6:25:11 PM, Wenger wrote to Amiri: "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!" Exh. 255, at p. 65. At 6:43:03 PM, Wenger wrote more: "Lets get faggot ass donleavy something to stress out about lol." *Id.* at p. 66. Captain Morefield's testimony explains who Donleavy was: a lieutenant with whom he had direct conversations about uses of force. Tr. 389-390. Seven minutes later, Amiri and Wenger found M.C., based on the date and time "received" listed on a police report pertaining to M.C. Exh. 251, at p. 1. Sixteen minutes later, at 8/22/2020 7:06:14 PM, and apparently referencing the concept in Wenger's last text message of giving "faggot ass Donleavy something to stress about," Amiri texted Wenger: "hahaha. [M.C.] style." Ex. 255, at p. 66.

Amiri took a photo of M.C.'s face following this incident; the left half of his face is covered in blood. Exh. 257. He sent the photo to Wenger at 12:42:53 AM the next morning. Exh. 255, at p. 67. But he also took cleaned up photos at 10:54 PM that night, almost four hours after the encounter, in

which M.C.'s face had been cleaned, and in which he was not shown from the front. *See* Exh. 254. Later text messages between Amiri and Wenger refer to "the face punches" as the "most punishment he got lol." Exh. 255, at p. 141.

Crucially, the report authored by Amiri does not reference face punches. "I did not use any use of force other than a takedown during my arrest of [M.C.]." Exh. 251, at p. 9. The severest injury Amiri described was a cut lip. *See id.* Nor did Amiri author a use of force report, *see* Tr. 822 ("There was no BlueTeam."), despite policy specifically requiring such reports for visible injury, *see* Exh. 5, at p. 5. The only reasonable explanation for the lack of documentation is that Amiri and Wenger viewed the amount of force exerted upon M.C. as unjustifiable.

Rombough testified that, at APD, any officer can see any other officer's filed report. Tr. 587. And yet there is no evidence that Wenger called Amiri out for this or that Amiri was otherwise disciplined. The evidence suggests Wenger kept the face punches between the two of them. He intended to help accomplish the purpose of the conspiracy.

### 4. Wenger's knowledge of and association with other co-conspirators

The government acknowledges that the evidence is sparser as to Wenger's interactions with Rombough—that there is more evidence of an agreement between Rombough and Amiri, on the one hand, and Amiri and Wenger on the other. But that in no way absolves Wenger of guilt from participating in the conspiracy. The jury will receive an instruction that

> even though the defendant did not directly conspire with other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt: (1) the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy; (2) that the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and (3) the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent on the success of the entire venture.

Dkt. 581, Instruction 29.

The government has met all three prongs of that test to show that Wenger joined the agreement between Amiri and Rombough.

First, Wenger knew that there was at least one other conspirator than Amiri: Eric Rombough. The previously-discussed texts show this, as do his statements to Rombough after he broke C.Y.'s arm and shot D.S. with the 40mm launcher. Specifically, he told Rombough about C.Y. and said, "The bitch got what she deserved." And after shooting D.S., Wenger told Rombough, "you would be proud of me." Rombough also testified to two conversations he had with Rombough after Wenger used excessive force. After Wenger broke C.Y.'s arm in October of 2019, he stopped to talk about it with Rombough in the hall at Antioch Police Department. Rombough testified that Wenger told him, "Bitch got what she deserved." Tr. at 662. Later, after Wenger used the Less Lethal Launcher for the first time, he told Rombough, "You would have been proud of me." Tr. at 663.

The government has already discussed examples of times that Wenger conspired with Amiri, as well as with Rombough—in particular, April 2019 texts and the "very eventful work week" in August 2021.

Finally, whatever benefits that Wenger might have obtained from the conspiracy were probably dependent on the success of the entire venture. In particular, they were dependent on the co-conspirators' success at hiding what they were doing. The benefits that Wenger stood to gain from the conspiracy depended on their conduct being sufficiently under the radar that it wouldn't attract too much attention. Antioch Police Department policy required that officers document any use of force "completely and accurately." Exh. 5, at 5. As former Antioch Police Captain Anthony Morefield explained, police records "become court records." Tr. at 430-31. And court records are "used later on to determine someone's innocence or guilt in a court proceeding." *Id*. at 431. If it were to become known that officer within the conspiracy were systematically omitting key details from their reports, their prosecutions would be undermined and their ability to continue using excessive force would be stopped. This is effectively what happened in March of 2022.

///

///

///

## III. Conclusion

The United States respectfully requests that the Court deny the defendant's motion for a judgment of acquittal.

DATED: September 15, 2025                              Respectfully submitted,

                                                                                CRAIG H. MISSAKIAN
                                                                                United States Attorney

                                                                                         /s/
                                                                                ALETHEA SARGENT
                                                                                ALEXANDRA SHEPARD
                                                                                Assistant United States Attorney