1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  ALETHEA M. SARGENT (CABN 288222)
   ALEXANDRA SHEPARD (CABN 205143)
5  Assistant United States Attorneys

6        1301 Clay Street, Suite 340S
         Oakland, California 94612
7        Telephone: (510) 637-3680
         FAX: (510) 637-3724
8        Alethea.Sargent@usdoj.gov
         Alexandra. Shepard@usdoj.gov
9
   Attorneys for United States of America
10
                    UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                         OAKLAND DIVISION
13

14 UNITED STATES OF AMERICA,          )  CASE NO. 23-CR-00269-JSW-3
                                       )
15         Plaintiff,                  )  UNITED STATES' OPPOSITION TO
                                       )  DEFENDANT'S RENEWED MOTION FOR
16    v.                               )  JUDGMENT OF ACQUITTAL
                                       )
17 DEVON CHRISTOPHER WENGER,           )
                                       )
18                                     )
           Defendant.                  )
19                                     )
                                       )
20 _____

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.     BACKGROUND ................................................................................................................1

II.    LEGAL STANDARD........................................................................................................1

III.   THE JURY'S VERDICT IS RATIONAL .......................................................................2

A.   A rational trier of fact could find that the government proved the first element of conspiracy, that a conspiracy to violate civil rights existed................................................5

B.   A rational trier of fact could find that the government proved the second element of conspiracy, that Devon Wenger joined the conspiracy...................................................8

      1.    A rational trier of fact could find that Wenger joined in the agreement at least as early as April 2019 knowing its purpose and intending to help accomplish it...............8

      2.    A rational trier of fact could find that the government also proved joining by proving all three prongs of Jury Instruction 20...................................................13

IV.   CONCLUSION................................................................................................................18

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**<u>Cases</u>**

*Burks v. United States,*
    437 U.S. 1 (1978) ................................................................................................................... 1

*Jackson v. Virginia,*
    443 U.S. 307 (1979) ............................................................................................................... 1

*Musacchio v. United States,*
    577 U.S. 237 (2016) ............................................................................................................... 1

*United States v. Bernhardt,*
    840 F.2d 1441 (9th Cir. 1988) .............................................................................................. 2

*United States v. Espinoza-Valdez,*
    889 F.3d 654 (9th Cir. 2018) ................................................................................................ 4

*United States v. Gonzalez,*
    906 F.3d 784 (9th Cir. 2018) ................................................................................................ 4

*United States v. Iribe,*
    564 F.3d 1155 (9th Cir. 2009) .............................................................................................. 3

*United States v. Lopez,*
    484 F.3d 1186 (9th Cir. 2007) .............................................................................................. 2

*United States v. Melchor-Lopez,*
    627 F.2d 886 (9th Cir. 1980) ................................................................................................ 4

*United States v. Nevils,*
    598 F.3d 1158 (9th Cir. 2010) .............................................................................................. 2

*United States v. Pemberton,*
    853 F.2d 730 (9th Cir. 1988) ................................................................................................ 4

*United States v. Ramirez,*
    714 F.3d 1134 (9th Cir. 2013) .............................................................................................. 5

*United States v. Reyes-Alvarado,*
    963 F.2d 1184 (9th Cir. 1992) .............................................................................................. 2

**<u>Statutes</u>**

18 U.S.C. § 241 ........................................................................................................................ 1, 3, 4

18 U.S.C. § 924 .............................................................................................................................. 5

**<u>Rules</u>**

Fed. R. Crim. P. 29 ................................................................................................................ 1, 2, 12

The Court should deny Defendant Devon Wenger's renewed motion for a judgment of acquittal on Count One because a rational trier of fact could—and did—conclude that former Wenger conspired to violate the civil rights of the very people he was sworn to protect.

## I.    Background

At trial, Wenger was convicted of conspiracy against rights, in violation of 18 U.S.C. § 241.  The government presented testimony from multiple witnesses, including former Antioch Police Department ("APD") Captain Anthony Morefield and current Chief of Police Joseph Vigil; law enforcement agents involved in the investigation—Contra Costa District Attorney's Senior Investigator Darryl Holcombe, FBI Special Agent Krystal Martinelli, and FBI Special Agent Armando Delgado-Campos; percipient former APD officers Shane Cole and Matthew Contreras; co-conspirator Eric Rombough; and conspiracy victims C.Y. and L.R.

The government also introduced evidence which corroborated witness testimony, including use of force reports, photographs, police body-worn camera ("BWC") and bystander videos, Wenger's own text messages, and text messages of co-conspirators Morteza Amiri and Eric Rombough.  And the government introduced the co-conspirators' police report narratives, which a side-by-side comparison with video and photographic evidence showed had been falsified as to key details.

## II.    Legal Standard

When considering a motion for acquittal under Federal Rule of Criminal Procedure 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  As the Supreme Court has explained, sufficiency review essentially addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." *Burks v. United States*, 437 U.S. 1, 16 (1978) (emphasis deleted).  "On sufficiency review, a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a meaningful opportunity to defend against the charge against him and a jury finding of guilt beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotations omitted).  This Court's "function . . . is quite narrow" because it is the "jury's exclusive function to determine the credibility of

1  witnesses, resolve evidentiary conflict and draw reasonable inferences from proven facts." *United*

2  *States v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988) (citation omitted).  Circumstantial evidence

3  and reasonable inferences drawn from that evidence alone are sufficient to sustain a conviction.  *United*

4  *States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

5  **III.    The Jury's Verdict is Rational**

6          Wenger argues in his motion that he was just an observer, that he at most he exhibited "passive

7  approval," Dkt. 610 at p. 7, that his texts were "isolated bluster," *id.* at p. 4, and that he had "inconsistent

8  associations" with Rombough and Amiri, *id.*[1]  To make this argument, he asserts to the Court what he

9  asserts is the "legal significance" of a number of quotes pulled from the trial transcript (both from

10  testimony and documentary evidence).  But these alternative interpretations of facts presented by the

11  government have no legal weight and do nothing more than attempt to usurp the jury's role in evaluating

12  facts and assessing credibility.[2] They do not change what the law requires.

13

14          [1] Wenger cites *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) multiple times for the proposition that "mere proximity or awareness of wrongdoing is insufficient" to demonstrate an

15  agreement, Dkt. 610 at 4, 5, 6, 7, and for the proposition that the Ninth Circuit requires objective proof that a defendant knowingly joined a conspiracy, *id.* at 8.  He includes a quote from the case in a

16  parenthetical, that "[m]ere proximity to the scene of a crime or association with conspirators is not sufficient evidence of participation." *Id.* at 7.  However, while *Lopez* is a Rule 29 case, it has nothing to

17  do with conspiracy law, does not contain the cited quotation, and does not stand for the cited propositions.  In *Lopez*, the Ninth Circuit found that the government did not meet its burden of showing

18  that a defendant who transported illegal aliens within the United States committed the crime of aiding and abetting the smuggling of illegal aliens into the United States.

19          [2] Not only do these alternative interpretations or innocent explanations not have legal weight, the Ninth Circuit has explicitly cautioned against the use of such innocent explanations in the Rule 29

20  context.  *United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (*en banc*).  Wenger cites *Nevils* for the proposition that "[w]here the government's case rests on speculation, suspicion, or ambiguous

21  inferences, the Constitution requires acquittal even after a guilty verdict." Dkt. 610 at p. 2.  But *Nevils* does not say this.  Rather, the Ninth Circuit in *Nevils* declined to find the government's proof

22  insufficient despite the defendant's assertion that he had presented an "innocent explanation for his actions at trial." *Nevils*, 598 F.3d at 1168.  The *Nevils* Court <u>disapproved</u> of a series of cases in which

23  the Ninth Circuit strayed from the holding in *Jackson v. Virginia* and found the government's case insufficient based on what the Ninth Circuit took to be an "innocent explanation" for various

24  conduct. *Id.* at 1166.  The *Nevils* court noted that this practice had been overturned by the Supreme Court for "fail[ing] to preserve the factfinder's role as weigher of the evidence" by "test[ing] the

25  sufficiency of the evidence against theoretical and speculative possibilities not fairly raised by the record, and … rely[ing] on hypotheses drawn from evidence which the jury may have disbelieved." *Id.*

26  1166 & 1167 (internal quotations omitted).  The Court held: "to the extent [our prior cases] construed evidence in a manner favoring innocence rather than in a manner favoring the prosecution,and required

27  reversal when such a construction was not any less likely than the incriminating explanation advanced by the government, they strayed from the test established in *Jackson*." *Id.* at 1167.

28

A violation of 18 U.S.C. § 241, conspiracy against rights, requires the government to prove two elements: 1) that beginning no later than February 2019 and ending on or about March 2022, there was an agreement between two or more persons to injure, oppress, threaten, or intimidate one or more persons in the free exercise or enjoyment of any right or privilege secured to them by the Constitution or laws of the United States, in particular, to be free from the use of unreasonable force; and 2) the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose. Dkt. 587 at p. 21 (Jury Instruction 18).

Importantly, the jury did not need to find that the co-conspirators actually used excessive force. This is because conspiracy to commit a crime "does not require completion of the intended underlying offense." *United States v. Iribe*, 564 F.3d 1155, 1160-61 (9th Cir. 2009); Dkt. 581 at p. 21 (Jury Instruction 18) ("The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed."). Put plainly, the agreement is the crime.

The jury instructions provided that "[a] conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." Dkt. 587 (Jury Instruction 20). Further, "It is not a defense that a person's participation in a conspiracy was minor or for a short period of time." *Id*.

The jurors were also instructed on one particular way the government could prove the second element of a violation of 18 U.S.C. § 241, that "the defendant has, in effect, agreed to participate in the conspiracy." *Id*. Wenger claims that the government failed to show the third prong of this latter test, that the co-conspirators' benefits were dependent on the success of the venture. But the government proved just that. Moreover, as just explained, this third prong is not an element of the crime, but one of the factors in one test whereby the government may prove a defendant joined a conspiracy in certain circumstances (as discussed in more detail in Section B.2, *infra*), and there was more than sufficient evidence for a rational jury to have found that the evidence proved both of the elements of conspiracy, the existence of the conspiracy and Wenger's having joined it, beyond a reasonable doubt. And although there is no requirement that co-conspirators actually carry out an agreement, there is abundant

1   evidence that the co-conspirators in this case did more than just talk about using unlawful force: they

2   went out and used excessive force in the community.

3         Indeed, the evidence showed that Wenger knowingly joined an existing agreement between

4   fellow Antioch Police Officers Eric Rombough and Morteza Amiri to use excessive force and also to be

5   able to continue using excessive force.  Like many conspiracy agreements, this was not an agreement

6   which was written, signed, or always discussed in specific terms.  The government nevertheless proved

7   the existence of the agreement in a variety of ways, including by testimony from co-conspirator Eric

8   Rombough, corroborated by text messages and falsified police reports, and also by showing that the co-

9   conspirators engaged in behaviors that were so antithetical to the work of a police officer that they are

10  inexplicable in the absence of an understanding between the officers to act.  *See United States v.*

11  *Gonzalez*, 906 F. 3d 784, 792 (9th Circuit 2018) (an agreement to use excessive force can be tacit or

12  implied; it does not need to be express);[3] Dkt. 587 at p. 21(Jury Instruction 18) ("For a conspiracy to

13  have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on

14  every detail of the conspiracy").[4]

15

16        [3] Wenger suggests that because the facts in this case are not a carbon copy of the facts in
    *Gonzalez*, in which a group of prison guards brutally assaulted a visitor to the prison and then

17  coordinated their stories, that the government's proof must fail. Dkt. 610 at p. 10.  Specifically, Wenger
    points to the *Gonzalez* court's use of the word "huddle" and asserts that without evidence of a "huddle,"

18  the government's case against Wenger must fail.  Yet there is no "huddle" element to 18 U.S.C. § 241.
    In fact, the circumstances in *Gonzalez*, a case in which, as here, text messages between officers bragging

19  about the amount of injury they had caused the victim surfaced after the victim had initially been
    charged with crimes, are quite similar to the case at hand.  For example, the report in that case included

20  a description of the victim's use of a handcuff on his hand as a weapon by wildly swinging it at officers
    to justify the use of force.  Indeed, the government presented circumstantial evidence that Wenger

21  participated in just the kind of "huddles" that *Gonzalez* described.  (Consider, for example, the seven-
    minute gap between the Wenger/Amiri text about giving a no-nonsense lieutenant "something to stress

22  out about" and the initiation of the stop on M.C., *see* Exh. 255 at p. 66; the absence of description of
    M.C.'s injuries in Amiri's report, *see* Exh. 251, and Rombough's testimony that officers did, in fact,

23  huddle to get falsifications correct.)  More to the point, the Ninth Circuit's finding that a certain set of
    facts are *sufficient* to sustain a conviction in no way sets some magical legal bar below which a different

24  case cannot fall (unlike what an insufficiency finding would do).

25        [4] In addition to the case citation issues pointed out more fully herein, there are several other case
    citations in Wenger's brief where the description of the case is inconsistent with the actual case.  With

26  respect to proof of an agreement, for example, Wenger writes: "The Ninth Circuit reaffirmed this
    principle in *Espinoza-Valdez*, 889 F.3d at 658–59, warning that the line between conspiracy and an

27  unexercised opportunity to join a conspiracy must be drawn where the existence of an agreement is
    absent."  It is *Melchor-Lopez*, 627 F.2d 886 (9th Cir. 1980), not *Espinoza-Valdez*, 889 F.3d 654 (9th Cir.

28  2018), that discusses unexercised opportunity.  Wenger also writes: "Unlike in *Pemberton*, where the
    defendant was engaged in negotiations and yet that still was not enough."  But *Pemberton*, 853 F.2d 730
    (9th Cir. 1988), is a case in which the Ninth Circuit found that the evidence of agreement *was*

1

2

**A.    A rational trier of fact could find that the government proved the first element of conspiracy, that a conspiracy to violate civil rights existed**

3      Eric Rombough's testimony, corroborated by text messages and falsified police reports, proved

4 that he and Morteza Amiri had an agreement to use excessive force.

5      Rombough testified that, after he came to APD, he acquired a certain view of the individuals he

6 policed, both people who made reports and suspects, seeing them as "numbers." *See, e.g.*, Tr. 500.  He

7 came to see calls for help as a waste of time and suspects as not deserving of rights.  *Id.*  He came to

8 resent their rights.  *Id.*  During the COVID lockdown, this sense increased as he saw people let off for

9 crimes, and he came to see his brutality as their punishment.  *Id.* at 501.  He came to relish the fact that

10 he was delivering punishment and to take pleasure from the violence.  In his view, for example, tasing

11 was not the same as "beating" a suspect's "ass" because "once the taser is done and he's in custody, it's

12 over."  Tr. 634.

13      Rombough knew that Morteza Amiri shared these views; Amiri was his most trusted

14 confidante.  *See, e.g.*, *id.* at 510.  Rombough even testified to a specific text message in which he and

15 Amiri discussed violating civil rights.  *See* Exh. 102 at p. 2188.  Although there is no requirement that

16 co-conspirators actually carry out an agreement, Rombough's testimony demonstrates that these were

17 not jokes; he described, in depth, times when he went out and exacted punishment on criminal suspects

18 in Antioch.  Indeed, in or around February 2019—the alleged starting point of the conspiracy—when

19 Amiri still had not gotten his first bite, Rombough began working with other officers to ensure that

20 Amiri's K9 bit a suspect, and Rombough was present for Amiri's first bite.  Tr. 613-619 & 748.

21

22

23 ────────────────

sufficient.  (Furthermore, the lines from *Pemberton* quoted from 5:16-20 as binding law are the Court's quotation of the defendant's argument, which was adopted by the lower court for its instructions.)  In another example, Wenger writes: "Likewise, *United States v. Ramirez*, 714 F.3d 1134, 1140-41 (9th Cir.

24 2013), reversed a conspiracy conviction where the government relied on conversations and presence but failed to prove actual assent. … In *Ramirez*, ambiguous conversations failed to show assent."  But in

25 *Ramirez* the government had relied merely on quantity of drugs to infer agreement.  There was no reference to conversations or discussions.  Finally, Wenger references *United States v. Thomas*, 987

26 F.2d 679 (11th Cir. 1993), which he refers to as a Ninth Circuit case.  It is an *Eleventh* Circuit case in which the court upheld a conspiracy count while overturning the defendant's conviction for aiding and

27 abetting another defendant's violation of 18 U.S.C. § 924(c) because there was no evidence linking the purported abettor to the gun.

28

As noted above, the government does not need to provide that the conspirators had a signed agreement or even a precise discussion of terms.  Nevertheless, as noted above, some of the things that the co-conspirators did were so inconsistent with and even antithetical to normal policing—exemplified by the testimony of Captain Morefield and the policies in evidence—that they are inexplicable in the absence of agreement.  Specifically, Amiri and Rombough looked for and even created opportunities to use excessive force; they interceded in one others' uses of force only when necessary to keep the other from getting caught; and they covered up for each other and falsified police records as necessary to ensure that they could continue using excessive force without sanction.

The evidence at trial showed that Amiri and Rombough looked for opportunities to hurt people, and even tried to create opportunities to hurt people.  On July 28, 2020, writing to Rombough about a local with criminal history named M.C., Amiri said: "I was hoping we could set up a dog bite and fuck him up."  Exh. 102 at p. 2363.  Rombough replied: "Ok bro.  I'm gonna try to catch him rolling."  *Id.*  Rombough testified that he understood Amiri to mean, "We'd frame him…"  Tr. 629.  The evidence shows that this plan was serious: as discussed later, Amiri *did* catch M.C. about a month later with Wenger, and one of the two delivered unreported face punches.  *See* Exh. 255 at 66-67 & 141-143; *see also* Exh. 257 (photo of injury).

They would also intervene in one another's uses of force, but only to keep one another from getting caught.  APD policy required that officers "intercede to prevent the use of unreasonable force."  Exh. 5 (Policy 300.2.1).  The evidence at trial showed that they did the opposite.  For example, Rombough testified about a suspect named B.S., who he (after texting Amiri, "let's find something good tonight," Exh. 102, p. 546) chased and caught on a night he was working with Amiri.  Tr. at 649-651.  Rombough punched B.S. even after B.S. was handcuffed.  Amiri stopped Rombough but only because "[t]he sergeant is on his way."  *Id.* at 653.  Following the incident, Amiri texted him, "we got more fuck faces we need you to kick in the face lol," and Rombough wrote back, "lol bro my hand hurts and its all swollen where I punched him in the mouth."  Exh. 102 at 553.

And the evidence shows they covered up for one another, including by falsifying police records and turning a blind eye to one another's falsified reports so that they could keep using excessive force.  Captain Anthony Morefield testified that APD policy required that uses of force be documented

"promptly, completely, and accurately." Tr. at 378; Exh. 5 (Policy 300.5); Exh. 7 (Policy 300.2). Chief Joseph Vigil testified that APD policy required that officers notify their supervisors as soon as possible when uses of force caused visible injury, or when a reasonable officer would conclude that the individual may have experienced more than momentary discomfort. Tr. at 797; Exh. 5 (Policy 300.5.1.), Exh. 7 (Policy 300.5.1). In contrast, Rombough explained that officers avoided documenting uses of force by getting together in the report writing room or wherever they wrote their reports, where they "ma[d]e sure your reports matched each other's." Tr. at 516. Rombough testified to concrete examples where he used force and did not report it. For example, he did not write in his report that he punched B.S. after B.S. was handcuffed, following the incident with Amiri described above. Tr. at 651. Regarding another incident, he once texted J.E.: "6 muzzle thumps and me trying to kick his head over the fence…Brock salty and I in a backyard with no cameras lol." Exh. 106 at 140. He testified that he omitted the head kick from his report and also explained what he meant in his text to J.E.: "That we could have got away with anything in the backyard. There was no cameras." Tr. at 655-656. He testified that he trusted J.E. not to report him. Tr. at 656. Similarly, about an incident at which they were both present and had BWC, Amiri texted Rombough: "do me a solid. don't face me and record my coo sniffs on bwc. it will open the door for defense to criticize the alert. my angle doesn't get it all." Exh. 102 at 3771. Rombough responded: "I got you. I'll [p]osition myself a little diff next time. I didn't want you to get ran over by him. I was gonna smoke him." Exh. 102 at 3773. Rombough explained that text in his testimony: "If there was a body-worn camera, it would actually capture the incident or him giving the dog a command versus what would be written in the report. If there was no body-worn camera, then he could write whatever he wanted on how the dog alerted." Tr. at 644.

Each of these practices of the conspiracy is antithetical to proper police work, which, as Captain Morefield suggested, is a matter of "public trust," *see* Tr. at 431, and therefore could not have continued absent the illegal agreement to which Rombough testified, which required mutual trust among conspirators. Indeed, Rombough testified that he chose how to behave incident-by-incident based on whether the officers on scene, including Amiri, were people he trusted to keep his secrets. Tr. at 575. And there were also people that Amiri, or others he trusted, vouched for, like Devon Wenger. Tr. at 510.

### B. A rational trier of fact could find that the government proved the second element of conspiracy, that Devon Wenger joined the conspiracy

#### 1. A rational trier of fact could find that Wenger joined in the agreement at least as early as April 2019 knowing its purpose and intending to help accomplish it

The evidence at trial showed that in the early morning hours of April 21, 2019, Wenger enlisted fellow Antioch Police Department officers Morteza Amiri and Eric Rombough's participation in finding and using excessive force on a suspect who ran.

A set of interlocking text messages between Amiri and Rombough; Amiri and Wenger; and all three together show how.  On April 20, 2019 at 3:40 P.M., Wenger texted Amiri and asked him for Rombough's telephone number.  Exh. 103 at 26.  At 5:19 P.M., Amiri said he'd been asleep and sent back a file titled "Rombough.vcf."  *Id.*  At 7:02 P.M., Wenger told Amiri, "No worries dawg."  At 7:12, Wenger texted both Amiri and Rombough:

> Hey guys its Wenger, so first of all I fucking love you guys. . .So last night JP talked to me about a priority 3 call in 6 that was pending for a while when he logged in. I don't know what happened but I guess somebody was thinking that Prieto and I were call dodging.  Normally I would Not give a shit what people think but I really like you guys and I don't want to you to have a negative opinion of me over some bullshit. . .I want to let you guys know that I would not avoid a paper call like some other fuck faces do. . . Thanks dudes, again I'm only texting you two because I like you guys and I sincerely care what you think. If anything like this happens again please let me know. I know how bad opinions of people can spread like wild fire here.

Exh. 107 at 1.

At 7:26 P.M., Amiri texted just Wenger to say that they would "98," or meet in person, later.  Exh. 103 at 27.  Wenger responded "Cool," but then asked: "What did I do wrong though?  If I fucked up let me know so I can fix the deficiency."  Exh. 103 at 28.  Amiri responded at 7:40 P.M., told him he was "good," and said, "[I] prefer to talk in person instead of text so things don't get misunderstood since there is confusion lol."  Exh. 103 at 28.

Rombough then wrote to both Wenger and Amiri at 7:42 P.M. virtually the same thing that Amiri had privately written to Wenger: "I'll 98 with you when I log on," and that he would "catch u in a bit."  Exh. 107 at 2.  A few minutes later Amiri wrote just to Rombough, "[I] told him the same thing as soon as he sent that."  Exh. 102 at 313.

The evidence does not confirm whether Amiri or Rombough had the promised in-person conversations with Wenger later that evening. However, within a few hours after their last group text, Wenger texted Rombough and Amiri again. He requested that Rombough and Amiri use force against a particular person who, he claimed, had run, and he included the suspect's photograph and booking information. What he said specifically at 12:49 A.M. on April 21, was: "*Please find this guys and fuck him in the ass*." Exh. 107 at 3 (emphasis added). Rombough wrote back a few seconds later, "Deal." *Id*. To ensure that Amiri and Rombough knew who to look for, a few seconds after that, Wenger texted Amiri and Rombough a photo and booking information for the person and wrote, "He's the fuck face that ran. Wants are 108 and 2800."[5] Exh. 107 at 4; Tr. at 661. And Amiri, the K-9 handler, responded about 40 minutes later, "[I]ll bite em." Exh. 107 at 5. Rombough testified that he was serious when he said, "deal," and that he took Amiri's statement that he would "bite em" seriously based on their relationship. Tr. at 662-63.

This one example, standing alone, shows a completed crime. Wenger did not ask Amiri and Rombough to arrest the individual. He asked them to "fuck him in the ass," a rape metaphor suggesting violence, despite his having no advance knowledge of whether the circumstances of a later encounter with this individual would in fact necessitate force, and Rombough and Amiri agreed, with Amiri specifically referencing the use of his K-9 to "bite" the individual. Wenger clearly joined the agreement: he initiated it. He knew the purpose of the agreement, again, because he initiated it. And he intended to help accomplish it, by providing a photograph and specific identifiers of an individual who would be a good target for force.

Were this one conversation standing by itself, a jury could potentially have found that Wenger did not understand the above back and forth to have been serious—in short, that he didn't truly understand the purpose of the agreement or intend to help accomplish it. But there <u>was</u> more evidence, <u>much</u> more, showing a variety of overt acts by Wenger, and that further evidence went precisely to the very real and tangible purpose and intent underlying Wenger's words in the above back-and-forth. Indeed, the evidence showed that Wenger practiced the same *modus operandi* of the conspiracy as did

---

[5] Rombough testified that 108 refers to a stolen vehicle and 2800 refers to "evading." Tr. at 661.

the others, looking for and even creating opportunities to use excessive force, not interceding, and covering up to ensure that he could continue using excessive force without sanction.

Wenger looked for opportunities to use force. A few keys on a lanyard provided him an opportunity to use force on testifying witness C.Y.'s sister; Captain Anthony Morefield recalled that in an early draft police report, Wenger had referred to the keys and lanyard exaggeratedly as "a bludgeoning instrument, or bludgeoning weapon, or a blunt force weapon." Tr. at 426. Later, Wenger and Amiri found M.C., seven minutes after Wenger told Amiri that the two of them should give an irksome lieutenant something to "stress out about." Exh. 255 at 66. The M.C. incident happened about a month after Amiri and Rombough had exchanged the texts in which they planned to use force on M.C. and shortly after Wenger texted Amiri, "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!" Exh. 255 at 65. Following the week in August 2020 when Amiri and Wenger assaulted M.C. and Amiri sent his dog to bite multiple people, Amiri texted Wenger: "let's fuck some people up next work week," and Wenger wrote back, "Fuck to the mother fucking yes." Exh. 255 at 74-75. And Shane Cole's request for the 40, during the D.S. incident, inspired Wenger to rush in front of Cole to get the weapon before Cole could. *See* Exh. 515.

A comparison of two incidents—the J.A. incident and the D.R. incident—shows that Wenger knew that what he and the others were looking to enact was not just legal force but <u>excessive</u> force. Following the J.A. incident, in which there had been body-worn camera, Amiri commented to Wenger that if "pitt" hadn't had body-worn cameras, "we would have fucked him up more." Exh. 255 at 62. This is just another way of stating the very definition of excessive force: more than reasonable force. Wenger replied: "I agree. That's why I don't like body cams." *Id.* A day later, Amiri described to Wenger a later incident that Wenger had not been present for, where a lack of body-worn camera allowed him to "fuck … up" a prone individual, D.R. *Id.* at 70. Wenger in his reply described the injury as a "tax" the individual had "paid" to Amiri for running. *Id.* at 71.

And, crucially, like the others, Wenger falsified police records. Wenger's assaults on C.Y. and her sister in October 2019 demonstrate this and some of these other behaviors that make no sense in the absence of an agreement. As demonstrated by the Event Report for the incident, Wenger conducted a license plate check at the women's house at 5:41 on October 20, 2019. Exh. 652. A minute and a half

1   later, Wenger reported to APD Dispatch that he was "fighting with one." *Id*. One minute after that,

2   Wenger reported that C.Y. was detained. *Id*. In his report, Wenger wrote that C.Y. started to run

3   towards the residence door after Officer Nilsen told her she was detained. Exh. 651. But Nilsen

4   testified that this was not true—that she was not really running. Tr. at 1232. Wenger also wrote in his

5   report that he grabbed C.Y.'s arm and told her to put her hands behind her back, and that she "refused by

6   pulling away from me and tensing her right arm." Exh. 651. C.Y. testified that what really happened

7   was that he grabbed her as soon as she left her car, shoved her against a wall, and broke her arm. Tr. at

8   268. An x-ray showed that Wenger had in fact broken her arm into multiple pieces. Exh. 668.

9       Once Wenger was done with C.Y., he turned to her sister. He wrote in his report that he asked

10   C.Y.'s sister twice whether she was at the Spirit Halloween store, and that instead of answering she

11   turned away from him "as if she might be preparing to flee." Exh. 651. He described "placing her

12   against a parked car" to handcuff her. *Id*. He said that as he was escorting her to a patrol car, she

13   attempted to pull away from him and that as a result of her actions she "subsequently fell onto the side

14   of the patrol vehicle." *Id*. Wenger's description of his interactions with C.Y.'s sister were largely

15   fiction. What <u>actually</u> happened was captured on a bystander video, Exh. 669, that APD didn't know

16   existed, Tr. at 448 (Morefield testimony). After Wenger asked C.Y.'s sister once whether she was at the

17   Spirit Halloween Store, he lunged forward and either pushed or attempted to grab her at her chest,

18   causing her to fall into a car and then to the ground. After subduing her, Wenger then picked her up,

19   walked her over to a patrol car, grabbed her by the neck, and, as shown below in stills from the video,

20   smashed her face into the side of the car. Exh. 669.

21

22

23

24    

25

26

27

28

1    Wenger also omitted these details, including facial injury, from his Use of Force report.  Exh.

2    667.  He instead described C.Y.'s sister as the "Primary Aggressor," and noted that she was charged

3    with Assault with a Deadly Weapon.  *Id*.  Wenger spoke with Rombough about C.Y.'s broken arm

4    afterwards; Rombough testified that Wenger told him the "bitch got what she deserved."  Tr. at 662.

5    In another example, following the D.S. incident, Wenger's supervisor J.E. texted him, "You are

6    going to have to justify why you shot him when his hands were raised shoulder height."  Wenger wrote

7    back, "be ready for a deescalation and use of force master piece reviewed by both [R.D.] and [K.P.]."

8    Exh. 509.  In the report dated after these texts, he wrote, "I did not want to, nor did I have any desire to

9    bring harm upon [D.S.]," Exh. 501, despite being caught on BWC saying that he wanted to "40," a

10    comment which was overheard by Officer Shane Cole, Exh. 511; Tr. at 1104 (Cole testimony).  And

11    although his own BWC and the BWC of other officers present showed that D.S.'s hands were up at

12    shoulder height, Wenger wrote in his report, "[D.S.] did not appear to me to have his hands up."  Exh.

13    501.  Even a defense witness, APD officer Kristian Palma, conceded that D.S.'s hands were up.  Tr. at

14    1168-1169.[6]  Wenger later told Rombough, who was known for using the 40, that he would have been

15    "proud" of him.  Tr. at 662.

16    Wenger argues that there was no "coordinated concealment."  Dkt. 610 at 10.  As discussed *infra*,

17    this is not an element of conspiracy.  But the evidence showed explicitly Wenger's and Amiri's

18    assistance of one another through concealment, not just in the M.C. incident but also through Amiri's

19    telling Wenger in late summer of 2020 that he had "squashed a complain[t] lol" after an unnamed

20    woman requested Wenger's name.  Exh. 255 at 93.  Wenger's response: "Fuck that bitch and her dumb

21    ass sister."  Exh. 255 at 94.

22    In short, Wenger's argument that he simply stood by, exhibiting nothing more than "passive

23    approval or professional routine," Dkt. 610 at 7, is belied by ample evidence showing that he joined the

24

---

25    [6] Wenger argues that the Court's ruling on the defendant's Rule 29 motion with respect to Count
Two confirms that the government's proof on Count One was insufficient.  This is not the case.  Indeed,

26    a conviction for civil rights conspiracy does not require that a defendant ever actually use excessive
force or even commit any overt act.  *See infra*. The elements of each crime are different, as was the

27    government's proof.  Wenger did try to convince the jury that the government's case was about the D.S.
incident, but his argument in court and in his motion not only ignores the abundant evidence, just some

28    of which is set forth in this memorandum, which had nothing to do with the D.S. incident but also a
variety of facts as to the D.S. incident itself that go to Wenger's desire to use force and his falsification.

agreement, knowing of its purpose and intending to help accomplish it.

### 2. A rational trier of fact could find that the government also proved joining by proving all three prongs of Jury Instruction 20

The jury was instructed that "even though the defendant did not directly conspire with other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:  The government can show that a defendant agreed to participate in the conspiracy if the government proves: 1) defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy; 2) the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and 3) the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.  Dkt. 587 at 24.

### (i) A rational trier of fact could find that Wenger conspired directly with Amiri

The government only needed to prove that Wenger directly conspired with one other co-conspirator, in this case Amiri, to use excessive force—and it did.  A series of incidents from the "very eventful work week" in August 2020, referenced above, shows how Wenger conspired with Amiri to use excessive force.

On August 21, Wenger, Amiri, and Amiri's K-9 Purcy assisted the neighboring Pittsburg Police Department with tracking car theft suspect J.A.  The incident was captured by a Pittsburg Police Officer's body-worn camera ("BWC").  Before they began tracking, Amiri can be heard asking the Pittsburg officer to let him know when the officer was "hot."  Exh. 302.  Lieutenant William Hatcher of the Pittsburg Police Department testified that he understood "hot" to mean "running;" that is, that the BWC was on.  Tr. at 863.  The Pittsburg officer informed Amiri immediately that he was "hot right now."  Exh. 302; Tr. at 861.  Together, they tracked J.A. to a stand of bushes, from which K-9 Purcy dragged him out.  The incident was captured on the Pittsburg body cam, which was admitted as Exhibit 302.

Later that night, Amiri and Wenger texted about what they would have done if the cameras had not been hot. Amiri texted Wenger, "if pitt didn't have all those body cams and that was us... we would have fucked him up more. he didn't get what he deserved." Wenger responded, "I agree. That's why I don't like body cams." Exh. 255 at 61-64. As explained above, by agreeing that he and Amiri would have used more force than was necessary to detain J.A. if there had been no body cams, Wenger effectively agrees with Amiri that without body cam they would have used excessive force.

On August 22, 2020, at 6:25 PM, Wenger wrote to Amiri: "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!" Exh. 255 at 65. At 6:43 PM, Wenger wrote more: "Lets get faggot ass donleavy something to stress out about lol." *Id.* at 66. Captain Morefield's testimony explained who Donleavy was: a lieutenant with whom he had direct conversations about uses of force. Tr. at 389-390. Seven minutes later, based on the date and time "received" listed on the pertinent police report, Exh. 251 at 1, Amiri and Wenger found M.C. Sixteen minutes later, at 7:06 PM, and apparently referencing the concept in Wenger's last text message of giving "faggot ass Donleavy something to stress about," Amiri texted Wenger: "hahaha. [M.C.] style." Exh. 255 at 66.

Amiri took a photo of M.C.'s face following this incident; the left half of his face is covered in blood. Exh. 257. He sent the photo to Wenger at 12:42 AM the next day. Exh. 255 at 67. But he also took photos at 10:54 PM, almost four hours after the encounter, in which the blood on M.C.'s face had been cleaned, and in which M.C. was not shown from the front. *See* Exh. 254. Later text messages between Amiri and Wenger refer to "the face punches" as the "most punishment he got lol." Exh. 255 at 141.

Crucially, the report authored by Amiri does not reference face punches. "I did not use any use of force other than a takedown during my arrest of [M.C.]." Exh. 251 at 9. The severest injury Amiri described was a cut lip. *See id.* Nor did Amiri author a use of force report, *see* Tr. at 822 ("There was no BlueTeam."), despite the APD policy which specifically required such reports for visible injury, *see* Exh. 5 at 5. The only reasonable explanation for the lack of documentation is that Amiri and Wenger viewed the amount of force used upon M.C. as unjustifiable.

Rombough testified that at APD, any officer can see any other officer's filed report. Tr. at 587. And yet there is no evidence that Wenger called Amiri out for this incident or that Amiri was

1    otherwise disciplined.  The evidence suggests Wenger kept the face punches between the two of

2    them.  By doing so, he intended to help accomplish the purpose of the conspiracy.

3         The evidence also showed that on August 23, Wenger clearly understood what happened when

4    the cameras <u>weren't</u> hot.  After tracking car theft suspect D.R. to a tent in a homeless camp, Amiri let his

5    K-9 Purcy loose.  He wrote later that night to Wenger, "bro we saw him laying in bed just acting like he

6    was asleep. i walked out the tent and game planned how to fuck him up. went back and did justice. wish

7    you were there. inside a tent with no cams... you would have loved it. oakley agreed to keep cameras

8    off."  Exh. 255 at 70.  Wenger wrote back, "Bro...fuuuuuuck yes!!! Fuck that nerd!! That's what fucking

9    happens when you run, you acquire a tax. His tax was paid properly! Good shit bro."  *Id*. at 71.

10        Similarly, after Amiri sent the officers on his shift booking photos and information on M.Z., said

11   M.Z. had stolen his mail, and offered a "bounty" to anybody who found him, Wenger wrote back to the

12   group: "Lets beat his fucking ass bro! I'm down after work morty."  Exh. 406.  Then, to show that he

13   was serious, he wrote privately to Amiri: "I'm serious bro, let's beat that dudes ass during work."  Exh.

14   103 at 188.

15        And, while Amiri and Wenger were texting following the D.S. incident, Amiri asked Wenger if

16   he'd been "dusted by a dirt bike" that day.  Exh. 103 at 294.  Wenger responded that he "was fucking

17   around with that kid trying to get him to wreck."  *Id*. at 297.  Amiri told him that it had been posted on

18   social media, and Wenger expressed some concern ("Fuck seriously?").  *Id*. at 298.  Amiri reassured

19   him: "they tagged the dude. we are gonna fuck him up."  *Id*. at 300.  Wenger responded with a "love"

20   emoji, and wrote, "haha fuck that kid. Get his ass."  *Id*. at 303-304.  But then Wenger said, "I hope I

21   don't get in trouble for trying to ghost stop that dude."  *Id*. at 305.  FBI Special Agent Armando

22   Delgado-Campos explained what a ghost stop was: unsanctioned police activity.  Tr. at 1152.  Amiri

23   reassured him again: "nahh. [J.E.] won't care. I only told [A.B.]."  *Id*. at 305.

24              **(ii)    A rational trier of fact could find that Wenger knew or had reason to
                         know that Amiri was conspiring with Rombough**

25

26        The evidence at trial showed that Wenger knew or had reason to know that Amiri was also

27   conspiring with Rombough.  The government has already described the three-way agreement between

28   Wenger, Amiri, and Rombough in April 2019 to use excessive force on a suspect who ran.  Prior to that

1  series of texts, Wenger reached out to Amiri to get Rombough's phone number.  Exh. 103 at 26.

2  Wenger's statements to Rombough after he broke C.Y.'s arm and shot D.S. with the 40mm

3  launcher further demonstrate that he knew that Rombough was part of the understanding.  Specifically,

4  after Wenger broke C.Y.'s arm in October of 2019, he stopped to talk about it with Rombough in the

5  hall at Antioch Police Department.  Rombough testified that Wenger told him, "Bitch got what she

6  deserved."  Tr. at 662.  Later, after Wenger used the 40mm launcher for the first time, on D.S., he told

7  Rombough, "You would have been proud of me."  Tr. at 663.

8  Nothing more is needed to prove that Wenger knew or had reason to know that Amiri was

9  conspiring with Rombough.

10              **(iii)    A rational trier of fact could find that Wenger had reason to believe
                   that whatever benefits he might get from the conspiracy were**

11                 **probably interdependent on the success of the entire conspiracy**

12  Finally, a rational trier of fact could have found that Wenger had reason to believe that whatever

13  benefits he might have obtained from the conspiracy were probably dependent on the success of the

14  entire venture.  The benefits to co-conspirators of the conspiracy included the ability to impose their

15  own form of punishment.  In Wenger's own words, "[t]hat's what fucking happens when you run, you

16  acquire a tax."  Exh. 255 at 70.  Another was sheer entertainment, which they expressed freely in their

17  communications as they planned to use excessive force or wrote about it afterwards.  The jury could see

18  Wenger's pleasure in some of their escapades in his own words and also on BWC.  *See*, *e.g.*, Exh. 255 at

19  72-73 (in response to Wenger's text of injury photos following "a very eventful work week," Wenger

20  wrote, "Hahahah FUCK YEAH BRO"); Exh. 103 at 16 ("[K] got in some solid hits and [M] straight

21  spartan kicked that fuck face pretty good lol"); Exh. 515 (D.S. post-arrest video).  Rombough testified to

22  still another object:  potentially advancing in the department.  He testified that "[w]hen I started using

23  force, I began to get noticed at the P.D."  Tr. at 502.  Wenger, after shooting D.S., told Amiri that he was

24  "just trying to get on SWAT."  Exh. 103 at 295.

25  These benefits were dependent on the co-conspirators' success at being sufficiently under the

26  radar that it wouldn't attract too much attention, which is why secrecy and falsification were key aspects

27  of the conspiracy.  The government presented multiple examples of this at trial.

28

In an example discussed above, Amiri assured Wenger that only two trusted officers—supervisor J.E., whom Rombough testified he trusted with the knowledge of his uses of force, Tr. at 509, and fellow officer A.B., who was also present for the M.C. incident, Exh. 251—knew about Wenger's off-the-books "ghost stop." Exh. 255 at 207. In another example, Amiri told Wenger that he was "pissed when i heard someone reported you. idk who the fuck said something and I'm not about that snitch shit. the fact that i had to question who it was just scared me (if it's even anyone in that thread)." Exh. 103 at 101. This time, it was Wenger assuring Amiri: "I heard it was either [M.H.] or [J.D.] overheard me telling someone about it so I don't know but I do 100% know is that [T.M.] is legit as fuck and had my back behind closed doors when LT was grilling him about it, then he called me told me what was going down and took the time to make sure [A.A.] said everything that he said." *Id.* These texts demonstrated that Wenger knew that if certain stories got to the wrong people, their exploits would end.

So do the falsehoods in Wenger's police reports. Wenger didn't write that he smashed C.Y.'s sister's face into a police car. He wrote that she fell. A rational juror could have concluded he knew he could do this because there was nothing in the bystander video collected by Officer Cole that day that contradicted that narrative. In fact, Captain Morefield testified that he had never seen the video showing C.Y.'s sister being led to the police car. Tr. at 448. Wenger also wrote that he saw D.S.'s left hand drop, despite the video evidence and testimony by Palma showing that D.S.'s left hand remained up from the time Wenger retrieved the Less-Lethal Launcher to the time he used it on D.S., Tr. at 1168-1169, and that he had "no desire" to harm D.S., perhaps to counteract the expression of desire to hurt D.S. that was caught on video and about which Officer Cole testified, Tr. at 1104.

If Wenger believed that he, Amiri, Rombough, and unindicted coconspirators had nothing to hide, there would have been absolutely no reason for him to lie in his police reports. But he did, because there were certain things—his unprovoked assault on C.Y.'s sister, the punches to M.C.'s face, his expression of desire to harm D.S.—that he didn't want anybody outside their circle of trust to know. Because, as Captain Morefield explained, police records "become court records," which are "used later on to determine someone's innocence or guilt in a court proceeding." Tr. at 430-31. They are "a matter of public trust." *Id.* If the public were given reason to believe they could not trust members of the Antioch Police Department, if it were to become publicly known that officers within the conspiracy

were systematically omitting or falsifying key details in their reports, at the very least APD might crack down on their behavior, ending their ability to entertain themselves by punishing people extrajudicially. At worst, they could actually be held to account for their use of excessive force on the people of Antioch.

**IV.    Conclusion**

The United States respectfully requests that the Court deny the defendant's motion for a judgment of acquittal on Count One.


DATED:  October 15, 2025                              Respectfully submitted,

                                                      CRAIG H. MISSAKIAN
                                                      United States Attorney

                                                      _____/s/_____
                                                      ALETHEA SARGENT
                                                      ALEXANDRA SHEPARD
                                                      Assistant United States Attorney