Dena Marie Young [SBN 215344]
LAW OFFICES OF DENA MARIE YOUNG
2751 4th Street, PMB #136
Santa Rosa, CA 95405
Telephone: (707) 528-9479
Email: dmyounglaw@gmail.com

Michael D. Schwartz, Esq. [SBN 166556]
THE MICHAEL SCHWARTZ FIRM
3580 Wilshire Boulevard, Suite 1260
Los Angeles, CA 90010
Telephone: (323) 793-6735
Email: mds@themichaelschwartzfirm.com

Kasey A. Castillo, Esq. [SBN 236690]
KC LAW GROUP
Mail: 31566 Railroad Canyon Road
Suite 2, PMB 1123
Canyon Lake, CA 92587
Telephone: (951) 364-3070
Email: kasey@kc-lawgroup.com

Attorneys for Defendant
DEVON WENGER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEVON WENGER,<br><br>Defendant. | Case Nos. 23-cr-00268-002 JSW<br>23-cr-00269-003 JSW<br><br>**DEFENDANT'S CONSOLIDATED SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>Date: December 2, 2025<br>Time: 1:00 p.m<br>Court: Hon. Jeffrey S. White |

Defendant DEVON WENGER, by and through his counsels of record, hereby submits his Sentencing Memorandum.

### INTRODUCTION

In case 23-cr-00268, Mr. Wenger was convicted following jury trial of Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(E)(i) [Count 1] and Destruction, Alteration and Falsification of Records in Federal Investigations in violation of 18 U.S.C. § 1519 [Count 4].

In case 23-cr-00269, Mr. Wenger was convicted following jury trial of Conspiracy Against Rights in violation of 18 U.S.C. § 241 [Count 1]. Mr. Wenger was acquitted by this Court of Deprivation of Rights Under Color of Law [Count 8].

These cases were consolidated for sentencing.

The presentence report calculates an adjusted offense level of 31. Combined with a criminal history category of I, the resulting guidelines range is 108-135 months imprisonment. No outstanding objections remain with respect to case 23-cr-00268 [Count Group 1]. In case 23-cr-00269, the defense agrees with the probation officer's decision to eliminate the conduct charged in acquitted Count 8 from sentencing consideration. However, significant disagreements remain with regard to the government's assertions of fact which are reflected in the presentence report, and regarding the scope of the conspiracy actually proved by the government in light of the acquittal of Morteza Amiri as a co-conspirator. These unresolved objections impact the calculation of total adjusted offense level. Based on the evidence at trial, defense counsels believe that the final adjusted offense level should be 27, with resulting guidelines of 70-87 months.

For the reasons discussed below, counsel for Mr. Wenger requests that this Court impose a custodial sentence of 36 months. Such a sentence would be a sufficient sentence within the meaning of *Gall v. United States*, 552 U.S. 38 (2007), and is consistent with the factors set out in 18 U.S.C. § 3553(a).

## I.

## OBJECTIONS TO THE PRESENTENCE REPORT

Counsel for Mr. Wenger has no outstanding objections to the criminal history calculation set forth in the Presentence Report. Mr. Wenger has no prior criminal history.

Counsel for Mr. Wenger accepts the probation officer's resolution of the adjusted offense level for Count Group 1 at level 14 based on the destruction of evidence charge rather than the drug guidelines [Case 23-cr-00268].

Counsel also agrees with the probation officer's decision to remove acquitted conduct in case 23-cr-00269 from sentencing consideration for the reasons set forth in the presentence report.

However, as noted above, there remain significant differences between the "facts" asserted by the government as reflected in the presentence report, and the evidence presented at trial in case 23-cr-00269. Specifically:

In ¶ 24: The Government claims multiple witnesses testified, but only Rombough, an alleged conspirator, was involved. It wrongly claims multiple co-conspirators testified; only Rombough did, and no evidence supports the presence of more than one conspirator since Amiri was acquitted of conspiracy. The statement about victim testimony is also inaccurate—CY, who was a suspect, not a victim, testified. CY was identified as a robbery suspect who attempted to flee and evade arrest, resulting in the application of force that she later claimed caused her injuries. There has never a determination that Wenger engaged in excessive force. These points will be addressed further in the objections. Officer Nielson testified contradicting CY's testimony that the force applied was excessive directly disproving the Government's position that the encounter was in furtherance of a conspiracy.

In ¶ 27: The government's summary materially misstates the trial record. The evidence did not show that Mr. Wenger agreed with, joined, or participated in any plan with Officers Amiri or Rombough to use excessive force or to conceal such force. The government relied heavily on Exhibit 102, which contained numerous text threads exchanged solely between Amiri and Rombough, including statements such as "I want to fuck someone up," "Bro I need to hit someone with my flashlight," and "We need to smash heads on Monument" (Exhibit 102) None of these messages mention Wenger, and no witness testified that Wenger saw, knew about, or endorsed them. Furthermore, Amiri was acquitted of the conspiracy; there is, therefore, no evidence that Wenger entered into a conspiracy that could not have existed (based on Amiri's acquittal). The government presented no independent evidence that Wenger joined any agreement to "create opportunities" for force, "intercede to avoid detection," or falsify reports. Its current description simply attributes the rhetoric and conduct of others to Wenger, which is

improper. Because the record does not support the government's claims, the characterization should be rejected.

In ¶ 28: The government's statement mischaracterizes the record. Rombough's testimony described his own attitudes and conduct, and the text messages relied upon were overwhelmingly private exchanges between Amiri and Rombough, in which Wenger did not appear and was not referenced (Exhibit 102). No witness testified that Wenger shared their views, participated in discussions about using unlawful force, agreed to conceal force, or falsified reports in coordination with them. The government's assertion that Wenger "joined" any such agreement is unsupported by the evidence and improperly attributes the state of mind and conduct of others to Wenger without independent proof. Again, this was Rombough's description of his own conduct. The government introduced no evidence that Wenger shared this belief or participated in uses of force for this purpose. The isolated statement of Amiri vouching for Wenger does not establish an agreement or shared unlawful purpose. The record contains no evidence that Wenger agreed to, planned, or coordinated excessive force with either officer.

In ¶ 29: The government's characterization of this April 20–21, 2019 message is inaccurate. The text reflects Wenger responding to workplace rumors about "call dodging" and seeking to clear up a misunderstanding, not soliciting, discussing, or agreeing to use excessive force. The message contains no reference to force, no request to use force, no plan to find a suspect, and no language suggesting participation in unlawful conduct. It is a reputational and relational text about wanting to be viewed as a reliable officer, not a statement of conspiratorial intent. No witness testified that this message related to excessive force, and no evidence links this exchange to any specific use of force. Therefore, it cannot serve as proof that Wenger joined any conspiracy. Any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 30: This exchange does not reflect Wenger joining any conspiracy. The texts show Wenger seeking clarification about a perceived interpersonal issue and asking whether he had done something wrong, not planning, requesting, or agreeing to use force. Amiri's response that they should "talk in person so things don't get misunderstood" likewise indicates uncertainty and

miscommunication, not shared unlawful intent. The follow-up message between Amiri and Rombough ("I told him the same thing as soon as he sent that") simply reflects their discussion of how to address Wenger's concern, not agreement to commit misconduct, and no statement in this thread references force, targets, or any unlawful purpose. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 31: The government's characterization overstates what the messages show. The text in which Wenger sent a photo and said "find this guy" reflects frustration about a suspect who fled, not an organized plan to use unlawful force. The message does not reference "excessive" or illegal force, and *the record contains no evidence that any force was actually used as a result of that text*. The quick responses ("Deal" / "I'll bite 'em") read as casual, reactive banter and humor—there is no follow-through, no coordinated plan, and no action tied to it. Wenger's text "Please find this guys and fuck him the ass," is offensive hyperbole and cannot be taken literally or to self-servingly interpreted to mean excessive force, especially when no evidence was presented to show any force, much less excessive force was used. This exchange, standing alone, does not show that Wenger entered into any agreement with Rombough (Mr. Amiri having been acquitted of conspiracy). It reflects frustration and informal officer chatter, not a shared intent to commit unlawful violence. Further, again, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted of conspiracy.

In ¶ 32: The government's statement improperly assumes its conclusion. The incidents it references were each addressed at trial as separate encounters with distinct circumstances, and none established that Wenger acted pursuant to any agreement with Amiri or Rombough. The government is grouping unrelated events to imply a conspiracy, yet there was never a factual finding nor determination that any or all of those incidents were relied upon by the jury as predicate or overt acts in furtherance of the conspiracy. It was the government's theory, but there was never any finding linking those acts to the conspiracy charge. Additionally, the use of force is legally permitted under the Fourth Amendment when reasonably necessary to detain or

apprehend a suspect, and whether force was justified in any given incident must be evaluated individually, not assumed collectively.

In ¶ 33: The government's description does not accurately reflect the trial testimony. The evidence showed that the Claudjanae and China Young incident occurred during a rapidly evolving and chaotic scene in which both sisters were actively resisting officers, and multiple officers were involved in the physical contact. Testimony from the scene established that Wenger's actions occurred during efforts to gain control and secure compliance, not as part of any coordinated plan to inflict harm, and there was no testimony that he intended to injure either individual. As it relates to China, no evidence was offered to prove that China was injured. China did not testify, no medical records were introduced, no photographs of injuries were introduced, only a still frame looking at the back of Wenger and China was introduced for the proposition, that somehow there was an injury to China's face, not depicted in that still photo and video; no contact between China Young and the vehicle is seen in the photo only a perception from behind.

The claim that Wenger "falsified" his police report is also unsupported by the record. The reports were consistent with Officer Nilson's testimony describing the struggle, and no witness testified that Wenger inserted false information or concealed force. The government's characterization replaces the actual evidence with self-serving interpretation and should be rejected.

In ¶ 34: The government's summary omits the context shown in the testimony. The scene was active and tense, with multiple people present, movement occurring, and officers giving commands which were being at times ignored, other times defied. Witness testimony differed regarding whether Claudjanae stepped quickly toward the residence or "ran," reflecting differences in perception—not intentional falsification. The report accurately conveyed Wenger's understanding of the event in real time, and no testimony established that he knowingly or even made a false statement. Moreover, no evidence or determination has been presented that the force used was excessive force given the circumstances Wenger faced attempting to effectuate the arrest of Claudjanae Young and China Young.

In ¶ 35: The government's description overstates the testimony and assumes disputed facts as true. The report states that Wenger attempted to detain Claudjanae and that she pulled away and tensed; the trial testimony reflected conflicting accounts about how quickly the physical struggle began and how much resistance occurred. The fact that Claudjanae later suffered a fracture does not establish that Wenger used unlawful force or that his report was false. No witness testified that Wenger intended to injure her, and the injury occurred during a dynamic, hands-on detention with a non-compliant felony suspect.

The fact that Rombaugh's claim that Wenger later told him the "bitch got what she deserved" appears in the record does not establish that he intended or used excessive force at *the time of the incident*. The text reflects a post-incident emotional reaction, not evidence of pre-planning, coordinated action, or purposeful infliction of injury. The trial testimony showed conflicting accounts of how the physical encounter began and whether Claudjanae was pulling away or complying, and the injury occurred during a fast-moving detention. The existence of an injury and a later comment made in frustration do not prove that the force used was excessive, nor that Wenger acted pursuant to any agreement or unlawful purpose.

In ¶ 36: The government's description oversimplifies and selectively characterizes the bystander video. Testimony at trial reflected that the scene was tense, multiple people were approaching, voices were raised, and officers were attempting to maintain control. The video does not show what China said, how she moved, or what Wenger perceived in that moment. Any difference between Wenger's report and the video reflects real-time perception versus later video review, not a falsehood. The video does not establish that Wenger intended to use unlawful force or acted as part of any agreement; it shows a rapid, ambiguous physical interaction during an evolving crowd-control situation.

In ¶ 37: The government's description overstates what the video actually shows. The bystander recording captures the back view only, without a side or profile angle, and therefore lacks depth perception regarding the distance between China's face and the patrol car. From that viewpoint, it is not possible to determine whether her face made contact with the vehicle, at what force (if it actually did), or whether any movement was a stabilizing maneuver versus a strike.

1  Any difference in wording between Wenger's report and the video reflects real-time perception
2  during a physically dynamic escort, not a falsification or excessive force.
3      In ¶ 38: The government's statement mischaracterizes the reporting requirements and the
4  record. The "Blue Team" entry reflects Wenger's understanding of the incident at the time,
5  which involved a rapidly developing struggle with multiple moving parts. The omission of
6  specific injury details does not establish intent to conceal anything, particularly where the video
7  and full incident reports were available to supervisors. Describing China as the "primary
8  aggressor" reflects Wenger's perception that she resisted and attempted to pull away, which was
9  supported by portions of the testimony and video evidence. The reference to the keys as a
10 potential weapon in an early draft does not show falsification; officers are trained to consider and
11 describe objects that could be used to strike during a physical encounter. This is also
12 corroborated by the video when one of the filming bystanders repeated "that's why you leakin'"
13 referring to Wenger bleeding from being assaulted by China with what he thought were keys in
14 her hand. None of this establishes a coordinated effort to misrepresent the event or participate in
15 any conspiracy.
16     In ¶ 39: The government's characterization assigns intent to Wenger that the record does
17 not support. The body-worn camera footage in this incident shows a standard K-9 apprehension,
18 coordinated with another agency, where the Pittsburg officer's camera was already recording.
19 The later text exchange reflects retrospective venting and frustration, not a plan to use unlawful
20 force. Wenger's response that he "doesn't like body cams" expresses a sentiment common
21 among many officers regarding administrative scrutiny and paperwork, not an agreement to
22 inflict excessive force. There is no evidence that Wenger took any action in this incident that
23 exceeded lawful force or that he coordinated with Amiri to do so. Further, again, any
24 characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on
25 conspiracy.
26     In ¶ 40: The government's position conflates separate strands of informal officer banter
27 with proof of a coordinated, criminal agreement involving Wenger. The record does show that
28 Amiri and Rombough discussed wanting a "dog bite" and to "fuck him up" in private messages

between them (see Ex. 102, pp. 2489–2494, read into the record). Those private Amiri–Rombough plans, however, do not alone transform Wenger's later, braggadocio-style texts into evidence that he joined a pre-existing unlawful plot, especially when one of the alleged "plotters" was acquitted of co-conspiracy.

Wenger's messages on August 22 are ambiguous, colloquial, and reflect posturing and frustration rather than a detailed plan or mutual undertaking; the mere temporal proximity between Wenger's texts and a later lawful contact with a wanted suspect does not prove a prior agreement or coordinated intent. The government offers no transcript evidence of joint planning, specific operational coordination, or corroborating actions showing Wenger agreed to an unlawful purpose. The government's inference therefore overreaches the record and should be rejected. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 41:  The government's description exaggerates the severity of the injury and misrepresents the record. There is no evidence that Wenger, nor anyone actually struck Chicklero. The photo the government relies on shows smeared blood, not "profuse bleeding," and the source, amount, and timing of that blood were not established at trial. The government also leaves out of its analyses and position the report of Officer Becerra, who was one of the officers on scene; the Becerra report being consistent with Amiri's report. The text exchange between Amiri and Wenger ("hahaha. chicklero style.") reflects post-incident commentary, not evidence of how the force was applied or that Wenger used or encouraged unlawful force. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 42: The government's characterization overstates what the November text exchange shows. The messages reflect after-the-fact banter and emotional commentary, not a description of what actually occurred during the arrest. The texts do not establish that face punches were used, when any injury occurred, or who caused it. No witness testified that Wenger struck Chicklero, directed force, or observed any force beyond the K-9 apprehension and takedown. The fact that Amiri did not reference certain details in his report or file a separate use-of-force

form concerns Amiri's reporting, not Wenger's conduct. There was no evidence that Wenger violated any reporting requirement or withheld force information. The government is inferring coordinated misconduct without evidentiary support. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 43: The government's reliance on this text exchange overstates what the record shows. These messages are retrospective, boastful commentary about an apprehension—venting and bravado after the fact—not proof that Wenger participated in planning or executing unlawful force. The trial testimony established a K-9 tracking and an apprehension; it did not establish that Wenger was present, that any officer intentionally turned off body cameras, or that Wenger directed or agreed to illegal conduct in that event.

Moreover, the photo and the post-event texts do not substitute for independent evidence of wrongdoing: they do not identify who inflicted any injury, when it occurred, or whether the force was excessive under the circumstances. Enthusiastic, crude post-hoc messages do not prove excessive force was used, nor the existence of a preexisting agreement or knowing participation by Wenger and therefore cannot support the government's conspiracy claim. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 44: The government's reliance on this exchange is misplaced. On its face, the texts read like post-shift, immature bravado, not a specific, actionable plan to commit unlawful violence. Absent any contemporaneous planning, logistical coordination, or follow-through tied to those words, the messages are ambiguous and insufficient to prove a criminal agreement. Moreover, the record contains no independent evidence that Wenger took steps to carry out any such scheme or that any unlawful force resulted from this remark. Standing alone, this colloquial exchange cannot support the inference that Wenger joined a conspiracy to use excessive force with someone who, again, was acquitted of such a conspiracy. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 45: The government's reliance on these texts to portray a planned, actionable assault is unsupported by the record. The messages appear in a group chat with blunt, colloquial

language and read as posturing and venting about a perceived theft—not as evidence of a concrete plan. There is no record evidence, only innuendo, that any assault on Mason Ziegler was ever carried out, that Wenger took any preparatory steps or even knew about such an amorphous event, or that the group coordinated a time, place, or means to commit violence. Further, Amiri was acquitted of conspiracy, contradicting the government's position placing him at the heart of the alleged conspiracy connected to Zeigler.

Moreover, isolated online bravado—especially in a group chat context—does not prove criminal intent or participation in a conspiracy. Without corroborating acts, victim injury, or testimony showing tying in Wenger or proving he acted on these messages, the PSR's characterization is speculative and should be removed or revised to reflect that the texts, standing alone, are ambiguous and non-probative. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

In ¶ 46: This description does not support the assertion that Wenger participated in or agreed to any unlawful conduct involving Ziegler. The testimony showed that other officers encountered Ziegler and that Amiri later arrived; there was no testimony that Wenger was present, involved in the stop, or aware it was happening in real time. In fact, the testimony at trial was that Wenger was on duty at the tie and, therefore, could have participated had he chosen to, directly contradicting the government's position.

Regarding the alleged event, the fact that officers stood several car lengths away and could not hear the interaction underscores that the encounter was not coordinated and provides no basis to link Wenger to any use of force or decision-making in that incident. The government's implication of Wenger is therefore unsupported by the trial record. Further, any characterization of Amiri being a coconspirator is incorrect in that Amiri was acquitted on conspiracy.

Under the Federal Rules of Criminal Procedure,) requires this Court, at sentencing, "must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing" *Fed.R.Crim.P., Rule*

*32(i)(3)(B)*. This Court is in a strong position to resolve disputed issues of fact as this Court heard the trial. This Court is also aware that Morteza Amiri, the only charged "conspirator," other than cooperating witness Eric Rombaugh, was acquitted of conspiracy on the same "facts." While the 9th Circuit permits inconsistent verdicts, the acquittal of Amiri raises questions regarding the scope of the conspiracy for which Mr. Wenger can be held responsible as the conduct engaged in by Amiri of his own accord was not reasonably foreseeable to Mr. Wenger, nor did he engage in that conduct personally.

The resolution of these issues is necessary to determine what incidents (meaning which Count Groups) should be included as objects of the conspiracy, which specific offense characteristics apply and ultimately how grouping points are assigned. Specifically, counsel for Mr. Wenger believes that the following changes to the presentence report should apply:

<u>Offense Level Computation – Count Group 3, ¶¶ 69,74</u>

No evidence was presented at trial that China Young actually received any injury as result of resisting arrest. Therefore, the three-level enhancement for injury pursuant to USSG § 2A2.2(b)(3)(B) does not apply. The resulting adjusted offense level for this count group is 20 rather than 23.

<u>Offense Level Computation – Count Group 4, ¶¶ 76,81</u>

No evidence was presented at trial that Marc Chicklero actually received any injury as result of the conduct of Mr. Wenger or any other officer. Therefore, the three-level enhancement for injury pursuant to USSG § 2A2.2(b)(3)(B) does not apply. The resulting adjusted offense level for this count group is 20 rather than 23.

<u>Offense Level Computation – Count Group 5, ¶¶ 82-89</u>

The conduct involved in this count group was engaged in by Amiri alone. At best, the evidence shows that Mr. Wenger was told about it after the fact. As Amiri was acquitted of conspiracy, this conduct cannot be part of any conspiracy. Therefore, it is not chargeable against Mr. Wenger. This count group should be eliminated.

Offense Level Computation – Count Group 6, ¶¶ 90,95

There is no evidence that the text messages established anything more than blowing off steam. There was no assault on Mason Ziegler, nor is there any evidence that any steps were taken to assault him. Further, the only possible "co-conspirator" to this text exchange was Amiri who was acquitted of conspiracy. This count group should be eliminated.

**Multiple Count Adjustment ¶ 96**

| Group/Count | Adjusted Offense Level – Draft PSR | Adjusted Offense Level – Corrected | Units (Corrected) |
|---|---|---|---|
| Count Group 1 | 14 | 14 | 0.0 |
| Count Group 2 | 25 | 25 | 1.0 |
| Count Group 3 | 23 | 20 | 0.5 |
| Count Group 4 | 23 | 20 | 0.5 |
| Count Group 5 | 27 | 0 | 0 |
| Count Group 6 | 16 | 0 | 0 |
| **Total Number of Units:** | | | 2.0 |

**Greater of the Adjusted Offense Levels Above**: ¶ 97

As discussed above, this should be 25 NOT 27

**Increase in Offense Level: ¶ 98**

The level increase based on 3 groups pursuant to the table at USSG §3D1.4 is +2 rather than the +4 in the draft PSR.

**Combined Total Offense Level / Total Offense Level ¶¶ 199, 102**

Adjusted offense level 25 + 2 gives a total offense level of 27 rather than 31 as set forth in the draft PSR.

**Guideline Provisions, ¶ 131**

Based on a total offense level of 27 and a criminal history category of I, the guidelines imprisonment range is 70-87 months.

**Judiciary Sentencing Information ¶¶ 151-152**

During the last five fiscal years (FY2020-2024), there were 6 defendants whose primary guideline was §2H1.1, with a Final Offense Level of 27 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 5

defendants (83%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 40 month(s) and the median length of imprisonment imposed was 33 month(s).

## II.

## OBJECTIONS TO THE GOVERNMENT REQUEST

It is anticipated that the government will argue for the inclusion of acquitted conduct related to Count 8 in case 23-cr-00269 as part of the basis for the conspiracy. As noted above, counsel for Mr. Wenger agrees with the probation officer's decision to exclude such conduct.

USSG § 1B1.3(c) states: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."

Mr. Wenger was acquitted of the use of force with respect to Dajon Smith. More than that, the court found that that no reasonable person could find that the force used was unreasonable. The conduct was legal and within the bounds of duty. As a lawful act, it cannot support a conspiracy charge either. Therefore, this count group was properly eliminated from sentencing consideration.

## III.

## THIS COURT SHOULD IMPOSE A SENTENCE OF 36 MONTHS BECAUSE IT IS A SUFFICIENT SENTENCE CONSIDERING THE FACTORS SET OUT IN 18 U.S.C. § 3553(A).

While the guidelines must be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence. *United States v. Carty*, 520 F.3d 984, 992 (9th Cir.2008). Sentencing courts must give "meaningful consideration" to all of the statutory factors in 18 U.S.C. §3553(a). Section 3553(a) clearly states that a court must impose a sentence that is "sufficient but not greater than necessary to comply with the purposes of sentencing. This requirement is often referred to as 'the parsimony provision," and the Supreme Court has referred to it as the "overarching instruction" of 18 U.S.C. §3553(a). See *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the offender's

conduct is part of the sentencing equation, it is not the totality of it, and the sentencing court must not focus on the offense at the expense of the individual offender. *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Ameline*, 409 F.3d 1073 (9th Cir.2005)(*en banc*). The sentence must be long enough to reflect the seriousness of the offense, provide for just punishment and promote respect for the law. Further, it should afford adequate deterrence to criminal conduct in general and protect the public. It must be "sufficient but not greater than necessary" to reflect societal concerns and individual considerations.

## IV.
## EVALUATION

Counsel for Mr. Wenger defers to the probation report for the description of Mr. Wenger's personal history and circumstances and believes that probation's evaluation of the case is well-reasoned. However, counsel for Mr. Wenger believes that the recommended sentence of 72 months is greater than necessary under the circumstances.

Mr. Wenger has no criminal history. Rather he has a record of pro-social behavior. He experienced a very difficult childhood as is described in the presentence report. Mr. Wenger served his country, first in the Army from which he was honorably discharged, then in the National Guard for another nine years. His deployment in Afghanistan involved clearing improvised explosive devices at great risk to himself. He experienced a great deal of violence in that role. Like many soldiers, he compartmentalized the trauma rather than seek counseling. However, he channeled his pain productively into sports and religion. He volunteered his time to coach youth sports in his church community.

Mr. Wenger has an established home with his wife, who is currently in the military. He will return to that home with her full support when he is released from custody. He has substantial support from his family and friends. Any sentence Mr. Wenger receives will be more difficult for him given his background as a police officer. His security needs may restrict his ability to participate in programming at whatever institution he is assigned. For someone who has never before been incarcerated, any sentence will be sufficient to make sure that he never places himself in such a position again.

A sentence of 36 months is in line with that received by others for the same conduct based on the JSIN data reported above. It is also not inconsistent with the sentence received by Amiri who was found to have personally perpetrated extremely violent acts for which Mr. Wenger was not present and not involved.

For these reasons, counsel for Mr. Wenger believes that a custodial sentence of 36 months followed by a period of supervised release would be a sufficient sentence. This represents a downward variance from the guidelines range but is consistent with the 18 U.S.C. § 3553(a) factors as applied to Mr. Wenger.

## CONCLUSION

For the foregoing reasons, Counsel for Mr. Wenger requests that this Court impose a custodial sentence of 36 months followed by a period of supervised release. Such a sentence is reasonable within the meaning of *Gall v. United States*, 552 U.S. 38 (2007) and consistent with the factors set out in 18 U.S.C. § 3553(a).

Dated: November 26, 2025   Respectfully Submitted,

\_\_/s /_____
DENA MARIE YOUNG

\_\_/s /_____
MICHAEL D. SCHWARTZ

\_\_/s /_____
KASEY CASTILLO

Attorneys for Defendant
DEVON WENGER